UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------x
ROBERT CHASE,
                        Plaintiff


            v.                                      Civil Action No.


UNITED STATES POSTAL SERVICE
and MICHAEL KING,
                        Defendants.
-----------------------------------------------------x

## COMPLAINT
(Jury Trial Demanded)

This is an action for:  1) interference with the plaintiff's use of the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq.*;

2) retaliation for the plaintiff's exercise of his rights under the FMLA; 3)

intentional interference with advantageous business relations; 4) intentional

infliction of emotional distress; and 5) defamation.

## INTRODUCTION

"I know not;
am I my brother's keeper?"
*New King James Bible*, Genesis 4:9

This case is about a family of letter carriers, a father who honorably

served the United States Postal Service for more than 35 years and the two

sons who followed in his footsteps, Robert and Michael Chase.  The plaintiff is

Robert Chase, a letter carrier with an impeccable record of service spanning over the course of 14 years, who took on additional job responsibilities involving safety and marketing without any additional compensation, who helped out his fellow co-workers as a union Shop Steward, and who was repeatedly recognized by the United States Postal Service for his accomplishments, his job performance, and his safe driving record. Mr. Chase's bright career was brought to a sudden halt when he was injured on the job in a terrible motor vehicle accident that killed the other driver and left Mr. Chase with physical injuries that have kept him out of work. He reported the accident, took his FMLA leave, and applied for workers' compensation benefits, despite pressure by his manager, the defendant Michael King, not to report the workplace injury as the report would negatively impact the statistics for the Brookline Branch, the rankings on which Mr. King's job performance, pay, and bonuses were measured. Despite this unlawful pressure from his manager, Mr. Chase exercised his rights. His application for FMLA leave was approved; likewise, his application for workers' compensation benefits was uncontested, uncontroverted, and approved.

Angered by Mr. Chase's transparency about his on-the-job injuries and motivated by animus towards injured workers and those who assist injured workers, Mr. King set out to ruin Mr. Chase's good name and reputation, treating him differently than non-injured letter carriers who did not take FMLA

leave, calling Mr. Chase "the biggest fraud when it comes to injuries" over the loudspeaker at work, badmouthing him to his co-worker(s), pressuring him to get his brother (Michael Chase) to resign, and latching on to an off-duty incident involving Mr. Chase's brother to justify his decision to terminate the plaintiff's employment while he was on leave.  As a result, Mr. Chase has lost the career that he cherished, has suffered damage to his good name and reputation, and has suffered emotional distress and other damages.  He seeks reinstatement and other remedies intended to make him whole.

<u>PARTIES</u>

1.      The Plaintiff Robert Chase is an individual with a last and usual residence in Charlestown, Suffolk County, Massachusetts.

2.      The defendant United States Postal Service ("USPS") is an agency of the United States government responsible for providing postal service in the United States.

3.      The defendant Michael King is a citizen of Massachusetts with a last and usual residence in Somerville, Middlesex County, Massachusetts.  At all relevant times, he was employed by USPS as the manager of the Brookline Branch, which is located at 1295 Beacon Street in Brookline, Norfolk County, Massachusetts.

4.      At all relevant times, the defendant Michael King supervised the plaintiff.

## JURISDICTION AND VENUE

5.    This action arises under 29 U.S.C. §2601, *et seq.*

6.    Federal question jurisdiction is invoked pursuant to 28 U.S.C. §1331.

7.    Supplemental jurisdiction over the plaintiff's state law claims is also invoked pursuant to 28 U.S.C. §1367.

8.    Venue is proper pursuant to 28 U.S.C. §1391(b), as the events giving rise to these claims occurred in the District.

## FACTS

### The Plaintiff's Working Conditions

9.    The plaintiff's family has a long history of working for USPS, beginning with Mr. Chase's father, who worked as a postal worker for more than 35 years.

10.    Mr. Chase followed in his father's footsteps and was hired by the United States Postal Service on December 6, 1997.

11.    From December 6, 1997 to September 24, 2011, Mr. Chase served as a letter carrier for USPS.

12.    As a letter carrier, Mr. Chase's job duties included inspecting his postal vehicle; retrieving letter and flat mail from the mail distribution case; and bending, lifting, sorting, loading, transporting, and delivering mail.

13.     Mr. Chase was an excellent performer who excelled in these job duties.

14.     Throughout his employment, Mr. Chase's work performance was satisfactory or above.

15.     Throughout his 14 years of service to the postal service, Mr. Chase was never disciplined.

16.     Throughout his 14 years of service to the postal service, Mr. Chase was never given any corrective action.

17.     Throughout his 14 years of service to the postal service, Mr. Chase was never given any negative performance review.

18.     To the contrary, Mr. Chase was commended for his outstanding job performance as a letter carrier.

19.     In addition to his letter carrier position, Mr. Chase took on additional job titles, functions, and duties for which he received no additional compensation.

20.     From November 1, 2008 to September 24, 2011, Mr. Chase served as a Customer Connect Coordinator for USPS (on top of his normal job duties as a letter carrier).

21.     Mr. Chase did not receive any additional compensation for his work as a Customer Connect Coordinator.

22.     As a Customer Connect Coordinator, Mr. Chase worked to bridge the gap between customers, union, and management; to identify potential revenue from people or businesses; and to follow up on leads with marketing teams.

23.     Mr. Chase excelled in this position; he more than satisfied the job duties and functions of a Customer Connect Coordinator.

24.     In 2010, USPS recognized Mr. Chase's outstanding efforts as a Customer Connect Coordinator and awarded him a $100.00 gift card.

25.     From December 20, 2001 to September 24, 2011, Mr. Chase also served as a Safety Coordinator for USPS (on top of his normal job duties as a letter carrier).

26.     Mr. Chase did not receive any additional compensation from USPS for his work as a Safety Coordinator.

27.     Mr. Chase was an excellent Safety Coordinator; he more than satisfactorily performed the job duties and functions of a Safety Coordinator.

28.     USPS has recognized Mr. Chase for his accomplishments and has given him awards, commendations, and positive feedback on his work.

29.     For example, in 2001, Mr. Chase received a $500 award for taking a difficult route through a successful audit.

30.     In 2002, Mr. Chase received a 5-year safe driver award.  Mr. Chase received this award in recognition of his excellent record, which included no accidents or written violations by management.

31.     In 2007, Mr. Chase received a 10-year safe driver award.

32.     Mr. Chase also served as Shop Steward for the letter carriers' union.

33.     As a Shop Steward, Mr. Chase advised his co-workers of the proper procedures for filing injury claims, among other duties.

34.     Mr. Chase satisfactorily performed the job duties and functions of a Shop Steward in the workplace.

<u>Mr. Chase's Supervisor Publicly Humiliates Mr. Chase
Because He Reported A Work-Related Knee Injury And Was Out-Of-Work For About
A Week</u>

35.     Since on or about 2006, Mr. Chase has been supervised by Michael King, who served as the manager of the Brookline Branch of the USPS at relevant times.

36.     On or about September 11, 2006, Mr. Chase injured his knee on the job, resulting in him being out of work for about a week.

37.     A couple of months after Mr. Chase returned to work, on or about November 2006, Mr. King got on the loudspeaker and said, "Will Bob Chase, the injury fraud specialist, please report to the office."

38.     Since Mr. King used the loudspeaker, more than 100 employees were able to hear him insult Mr. Chase.

39.     Postal customers in the lobby may also have overheard the announcement.

40.     When Mr. King got off the loudspeaker, he laughed.

41.     This statement was false, malicious, defamatory, and intended to harm Mr. Chase.

<u>Mr. Chase Is Injured in A Serious On-the-Job Motor Vehicle Accident</u>

42.     On or about July 21, 2010, Mr. Chase was involved in a serious motor vehicle accident on the job and was injured.

43.     An elderly woman hit Mr. Chase's vehicle while it was parked during work hours.

44.     Mr. Chase was inside the car at the time of the accident.

45.     The elderly woman died as a result of the accident.

46.     As a result of the July 21, 2010 car accident, Mr. Chase was seriously hurt.

47.     Mr. Chase was trapped inside the car for at least 45 minutes and had to be removed from the vehicle by the local fire department.

48.     Mr. Chase's supervisor, Mr. King, was immediately notified and came to the scene of the accident.

49.     Mr. King observed the severity of the motor vehicle accident.

50.     Mr. King observed Mr. Chase trapped in the car.

51.     Mr. Chase was seriously injured as a result of the accident.

52.     Mr. Chase's injuries included shoulder and upper arm sprain and damage to his rotator cuff.

53.     Mr. King saw Mr. Chase's injuries firsthand at the scene of the accident.

### Mr. King Pressures Mr. Chase Not to File a Workers' Compensation Claim

54.     After the motor vehicle accident, Mr. King pressured the Chief Shop Steward in Mr. Chase's union (the National Association of Letter Carriers ("NALC")) to get Mr. Chase not to file a workers' compensation claim so that his injury would not show up in the statistics for the Brookline Branch, the rankings on which Mr. King's job performance, pay, and bonuses were measured.

55.     Mr. King instructed the Chief Shop Steward to avoid the injury claim.  Mr. King asked the Chief Shop Steward to get Mr. Chase to file against the driver and not make the claim with USPS.

56.     Due to the pressure he felt from Mr. King, the Chief Shop Steward asked Mr. Chase not to file a workers' compensation claim.

### Mr. Chase Requests FMLA Leave and Files a Workers' Compensation Claim

57.     Due to the injuries he suffered as a result of the July 21, 2010 motor vehicle accident, Mr. Chase applied for FMLA leave.

58.     Despite his manager's unlawful attempt to avoid the injury claim (which would have looked bad on his statistics), on or about July 22, 2010, Mr. Chase also filed a workers' compensation claim.

59.     Mr. Chase timely submitted all of the required paperwork for his applications for FMLA leave and for workers' compensation benefits.

60.     Although the injury claim was uncontroverted, USPS withheld Mr. Chase's pay for months without explanation.

61.     Every 10 days, as required, Mr. Chase would enter the office and bring in the necessary medical documentation about his injury.

62.     There was nothing fraudulent about Mr. Chase's application for FMLA leave and/or his application for workers' compensation benefits; Mr King knew this.

63.     Mr. Chase's applications for FMLA leave and for workers' compensation benefits were uncontested and uncontroverted; Mr. King knew this.

64.     Mr. Chase's application for FMLA leave was accepted and approved of by the United States Department of Labor on or about August 3, 2010; Mr. King knew this.

65.     Mr. Chase's application for workers' compensation was accepted and approved of by the United States Department of Labor's Office of

Workers' Compensation Programs on or about September 16, 2010; Mr. King knew this.

### Mr. Chase's Supervisor Misuses the Loudspeaker at Work to Embarrass, Insult, and Humiliate Him for Taking FMLA Leave and for Reporting An On-the-Job Accident

66.     When he came into work to file his CA7 injury form at the end of July or beginning of August 2010, Mr. Chase was greeted by another outburst from Mr. King, instead of the kindness and good wishes one would expect when first returning to the work site after an on-the-job accident.

67.     When Mr. Chase walked into the work site, Mr. King picked up the phone at the supervisor's desk on the open floor.

68.     Mr. King made an announcement over the loudspeaker directed at Mr. Chase.  Mr. King said, "There's a job posted on the bulletin board since you're the biggest fraud when it comes to injuries."

69.     The job posted on the bulletin board was for an injury compensation specialist.

70.     This statement was heard by Mr. Chase's co-workers and possibly by postal customers in the lobby since it was made over the loudspeaker.

71.     This statement was false, malicious, defamatory, and intended to harm Mr. Chase.

<u>Mr. Chase's Supervisor Attempts to Ruin Mr. Chase's Good Name and Reputation In
Retaliation for His Taking FMLA Leave and Filing a Workers' Compensation Claim.</u>

72.     Mr. King asked Mr. Chase's co-worker, the Chief Shop Steward

for the National Association of Letter Carriers, Joseph DeMambro, whether

Mr. Chase was giving advice to a co-worker who had been injured on the job,

Amy Thebearge.

73.     During this conversation, Mr. King expressed to Mr. DeMambro

Mr. King's belief that Mr. Chase was the "biggest fraud when it comes to

workers' comp."

74.     Mr. King seemed to have a problem with employees who were

injured on the job, including Mr. Chase.

75.     Mr. King expressed to Mr. DeMambro many times his concern

over his rankings, which were impacted negatively by having injured employees

at his branch out on medical leave and by having injured employees on

workers' compensation.

<u>Mr. Chase is at the Wrong Place at the Wrong Time</u>

76.     On or about September 18, 2011, Mr. Chase was at his brother's

home when the police arrived to investigate a complaint of domestic abuse.

77.     When the police arrived, they arrested Mr. Chase and his brother.

78.     Mr. Chase was not working at the time of the arrest.

79.     Likewise, Mr. Chase's brother (who was also a postal worker) was not working at the time of the arrest.

80.     Mr. Chase was not engaged in any criminal activity.

81.     Mr. Chase was arrested and charged with drug-related charges based on items allegedly found by the police while searching his brother's home.  None of these items belonged to Mr. Chase, who was just visiting with his family.

82.     Following this incident, Mr. Chase's brother (who was also a postal worker) was placed on emergency off duty status.

83.     Mr. Chase was not placed on emergency off duty status.

### Five Months After Being Arrested, Mr. Chase Loses His Job

84.     On February 1, 2011, USPS sent Mr. Chase a Notice of Removal.

85.     Mr. Chase was on FMLA leave when the Notice of Removal was issued.

86.     The Notice of Removal arrived approximately five months after the arrest at issue and during the midst of a contentious unemployment hearing concerning Mr. Chase's brother's application for unemployment benefits.

87.     According to the Notice of Removal, which was signed by Mr. Chase's supervisor, Mr. King, Mr. Chase's removal was based on alleged violations of the following two sections of USPS' Employee & Labor Relations Manual:

**665.25 Illegal Drug Sale, Use, or Possession:**  The Postal Service will not tolerate the sale, possession, or use of illegal drugs, or the abuse of legal drugs while on duty or on postal premises.  Employees found to be engaged in these activities are subject to discipline, including removal and/or criminal prosecution where appropriate.

**665.16 Behavior and Personal Habits:**  Employees are expected to conduct themselves during and outside of working hours in a manner that reflects favorably upon the Postal Service.  Although it is not the policy of the Postal Service to interfere with the private lives of employees, it does require that postal employees be honest, reliable, trustworthy, courteous, and of good character and reputation.  The Federal Standards of Ethical Conduct referenced in 662.1 also contain regulations governing the off-duty behavior of postal employees.  Employees must not engage in criminal, dishonest, notoriously disgraceful, immoral, or other conduct prejudicial to the Postal Service.

88.     The reasons stated in the Notice of Removal for Mr. Chase's dismissal were not truthful.

89.     Mr. Chase had not engaged in any wrongdoing.

90.     Mr. King knew that Mr. Chase did not take drugs, sell drugs, or otherwise have a drug problem.

91.     Rather, Mr. King selected Mr. Chase for removal because he took FMLA leave; applied for workers' compensation benefits; reported his on-the-job accident; and assisted his co-workers who had injury claims (as a union Shop Steward) in doing the same.  Mr. King also attempted to use Mr. Chase's dismissal as leverage to get rid of his brother, Michael Chase, who Mr. King viewed as having a drug problem.

92.     Mr. King treated Mr. Chase more harshly than similarly-situated employees because of his animus towards employees who have medical problems, who have taken FMLA leave, who report workplace accidents, and/or who exercise their rights to workers' compensation benefits.

93.     Mr. King treated Mr. Chase more harshly than similarly-situated employees because of his animus towards Mr. Chase's brother, Michael Chase.

94.     Through USPS' labor representative, Michael DeMatteo, the defendants demanded on at least four separate occasions that Mr. Chase get his brother to resign from the USPS.  Mr. Chase was repeatedly told that he could have his job back if he could get his brother to resign.

95.     Feeling torn between his loyalty to his brother, his loyalty to USPS, and his need for a paycheck, Mr. Chase was emotionally distressed by these ultimatums.

96.     Mr. Chase felt that it would be wrong to pressure his brother to resign.  Instead, he decided to pursue the matter on its merits and followed the union grievance procedures for opposing his removal from the postal service.

97.     Through its labor representative, Michael DeMatteo, USPS admitted its intent to remove Mr. Chase from his job because of his injury.  In particular, during the arbitration of Mr. Chase's Step 4 Grievance, Mr. DeMatteo stated, "Don't let Mr. Chase fool you; he has been living a great, tax

free life while the rest of us have to come to work. For all he knows, all his paperwork is fraudulent".

98.    The subject matter of the arbitration had nothing to do with Mr. Chase's injury.  Rather, the arbitration was supposedly focused on whether USPS had grounds to remove Mr. Chase based on his off-duty conduct in getting arrested.

99. During the arbitration, Mr. Chase notified USPS that all charges against him had been dismissed.

100.    Although all criminal charges against Mr. Chase had been dismissed, USPS continued to pursue his dismissal from employment.

101.    On or about December 15, 2011, the arbitrator issued a decision upholding the Notice of Removal and denying Mr. Chase's grievance.

<u>Mr. Chase Is Treated Worse Than Similarly-Situated Employees Who Had Not Taken FMLA Leave</u>

102.    Other letter carriers stationed at the Brookline Post Office (and at other post office locations) who had not taken FMLA leave engaged in substantially worse behavior than Mr. Chase, were not cleared of criminal charges, and were allowed to continue working for USPS.

103.    For example, on or about August 31, 2006, a Brookline letter carrier, James Ferretti, was arrested for drug-related charges while on the clock. Police found cocaine, syringes, and other drug-related items on Mr. Ferretti,

along with mail he was supposed to be delivering to Brookline residents.  When police arrested Mr. Ferretti, he had fresh needle marks on his arms and scarring from injections; consistent with drug use, his face was ash white and he was sweating.  Mr. Ferretti was not cleared of these criminal charges.  Mr. Ferretti's arrest was publicized in local newspaper(s).  Mr. Ferretti had the same supervisor as Mr. Chase – Mr. King.  Nevertheless, Mr. Ferretti was allowed to continue working for USPS.

104.    On or about July 14, 2009, another letter carrier, John Magill, was arrested and charged with trafficking in cocaine, distribution of cocaine, and conspiracy to violate the Controlled Substances Act.  Mr. Magill was not cleared of these criminal charges.  Mr. Magill's arrest was publicized in local newspaper(s).  Nevertheless, Mr. Magill was allowed to continue working for USPS.

<u>The Defendants' Motivation</u>

105.    The ostensible reason for the plaintiff's dismissal was pretextual.

106.    The defendants' conduct, as more particularly set forth above, was willful and knowing.

107.    The defendants' conduct, as more particularly set forth above, was intended to and did harm the plaintiff.

108.    The defendants' conduct, as more particularly set forth above, has caused the plaintiff to suffer emotional distress, and continues to do so.

109.    The defendants' conduct, as more particularly set forth above, was made with the knowledge and intent to violate state and federal law.

110.    The defendants' conduct, as more particularly set forth above, was carried out with actual malice.

111.    The defendants' conduct, as more particularly set forth above, was outrageous and egregious, and warrants condemnation and deterrence.

<u>CLAIMS</u>

COUNT I
*Interference with Use of the Family and Medical Leave Act,* 29 U.S.C. §2601, *et seq.*
Against all Defendants

The plaintiff reiterates the allegations of the foregoing paragraphs and incorporates them by reference herein.

112.    The defendants are employers under the FMLA, 29 U.S.C. §2611(4), and subject to its provisions.

113.    The shoulder and upper arm sprain and damage to the plaintiff's rotator cuff that he suffered as a result of the July 21, 2010 motor vehicle accident constituted a serious health condition pursuant to 29 U.S.C. §2611(11).

114.    Under the FMLA, 29 U.S.C. §2612, the plaintiff was entitled to take up to twelve weeks of intermittent leave during any 12-month period.

115.    The defendants had a duty to refrain from interfering with, restraining, and/or denying the exercise or the attempt to exercise the plaintiff's rights under 29 U.S.C. §§2611, *et seq.*

116.    As more particularly described above, the defendants interfered with the plaintiff's exercise of his rights under FMLA by, *inter alia*, discouraging him from reporting his workplace injury, publicly humiliating him when he brought his injury paperwork into the office, denying him reinstatement following FMLA leave, and, ultimately, by dismissing him from USPS' employ for having exercised his rights under the statute.

117.    The interference described above violated the plaintiff's rights under the FMLA.

118.    The defendants are liable to the plaintiff for violating his rights under the FMLA, 29 U.S.C. §2615.

119.    The interference described more particularly above was willful and intentional, and deserves condemnation and deterrence.

COUNT II
*Retaliation for Use of the Family and Medical Leave Act,* 29 U.S.C. §2601, *et seq.*
Against all Defendants

Plaintiff reiterates the allegations of the foregoing paragraphs and incorporates them by reference herein.

120.    The plaintiff was an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. §2611(2)(a)(i)(ii).

121.    The plaintiff requested leave for a serious health condition.

122.     The plaintiff's injuries to his shoulder incurred as a result of the July 21, 2010 car accident constitutes a serious health condition within the meaning of the FMLA.

123.     The plaintiff was entitled to receive leave pursuant to the FMLA.

124.     The plaintiff provided notice to the defendants that he suffered from a serious health condition and that he needed to take time off to recover from a serious health condition.

125.     On or about August 3, 2010, the plaintiff's request for FMLA leave was approved by the United States Department of Labor.

126.     The defendants were not permitted to retaliate against the plaintiff for exercising his rights under the FMLA.

127.     By dismissing the plaintiff from their employ, and in divers other ways as more particularly described above, the defendants retaliated against him for exercising his rights under the FMLA.

128.     Retaliation for exercise of rights protected by the FMLA is a violation of law.  29 U.S.C. §2615(a).

129.     The defendants are liable for the violation of law set forth above.

130.     The defendants' conduct in retaliating against the plaintiff for the exercise of his rights under the FMLA was willful and intentional.

131.   The defendants' conduct in retaliating against the plaintiff for the exercise of his rights under the FMLA was outrageous, and warrants condemnation and deterrence.

COUNT III

*Intentional Interference with Advantageous Business Relations*
Against the Defendant Michael King

Plaintiff reiterates the allegations of the foregoing paragraphs and incorporates them by reference herein.

132.   The plaintiff had an advantageous employment relationship with USPS.

133.   The plaintiff had an expectation of continued employment with USPS.

134.   By his conduct, as more particularly set forth above, the defendant Michael King wrongfully procured the termination of the plaintiff's employment relationships with USPS.

135.   The defendant, Mr. King, wrongfully sought to interfere with the plaintiff's employment relationship with USPS because of his familial relationship with his brother, whom Mr. King sought to remove from USPS.

136.   The defendant, Mr. King, wrongfully sought to interfere with the plaintiff's employment relationship with USPS because he exercised his rights under the FMLA.

137.    The defendant, Mr. King, wrongfully sought to interfere with the plaintiff's employment relationship with USPS because he was injured on the job.

138.    The defendant, Mr. King, wrongfully sought to interfere with the plaintiff's employment relationship with USPS because he reported a workplace accident and his related injuries.

139.    The defendant, Mr. King, wrongfully sought to interfere with the plaintiff's employment relationship with USPS because he applied for and received federal workers' compensation benefits.

140.    The defendant, Mr. King, acted out of improper means and/or motive.

141.    The defendant's conduct, as more particularly set forth above, was motivated by actual malice.

142.    The defendant's conduct was outside the scope of his employment.

143.    As a result of the above conduct, the plaintiff suffered actual pecuniary harm, including, but not limited to, lost compensation, lost benefits, lost earning capacity, and attorney's fees and costs, as well as emotional distress.

## COUNT IV
*Intentional Infliction of Emotional Distress*
Against Defendant Michael King

Plaintiff reiterates the allegations of the foregoing paragraphs and incorporates them by reference herein

144.   USPS maintains a policy, entitled "Postal Service Policy on Workplace Harassment," which states that "[t]he Postal Service's workplace must be one in which all employees are treated with dignity and respect by supervisors, subordinates, and coworkers."

145.   Pursuant to this policy, managers are required to "… take prompt action to prevent, address, and remedy workplace conduct that is contrary to this policy."

146.   USPS gave the defendant Michael King supervisory authority over the plaintiff; Mr. King exercised such authority.

147.   Mr. King abused his supervisory authority, causing the plaintiff to suffer insults, embarrassment, and the loss of his job because of his familial relationship with his brother, because he reported a workplace accident/injury, applied for and received federal workers compensation benefits, and because the plaintiff took a medical leave under the Family and Medical Leave Act due to his serious health condition, which was caused by an accident on the clock.

148.   The defendant Michael King's conduct was outside of the scope of his employment.

149.    The defendant Michael King's conduct, as more particularly described above, constitutes conduct which is extreme, outrageous, and beyond all possible bounds of human decency.

150.    The defendant Michael King's conduct as more particularly described above, is utterly intolerable in a civilized community in violation of the common law of Massachusetts.

151.    The defendant Michael King's conduct, as more particularly set forth above, caused the plaintiff severe emotional and physical pain and distress.

152.    The defendant Michael King's conduct in violation of law, as more particularly set forth above, was intended to inflict emotional distress.

153.    The defendant Michael King knew or should have known that emotional distress was the likely result of his conduct.

154.    The plaintiff's damages continue.

<u>COUNT V</u>
*Defamation*
Against The Defendant Michael King

155.    The above statements about Mr. Chase made by the defendant Michael King were defamatory and were defamatory *per se*. These statements held the plaintiff up to public scorn.  They disparaged his good name and reputation. The allegation that Mr. Chase had engaged in fraud and/or in unethical conduct was a statement of a type that would and did discourage

persons from associating with Mr. Chase, personally and professionally. The defendant's statements about Mr. Chase held him up to scorn and contempt in the minds of a considerable and respectable segment in the community.

156.    All of these statements about Mr. Chase made by the defendant were false on their faces and were misleading in that they implied that Mr. Chase had engaged in fraud, filed a false workers' compensation claim, and had taken advantage of FMLA leave without a legitimate need to do so, conduct the defendant knew had not taken place.

157.    Mr. King was motivated to make these defamatory statements by actual malice because of his animus toward injured workers and his personal concerns over the ratings for the Brookline Branch, on which his performance, pay, and bonuses were evaluated.

158.    Mr. King was acting outside the scope of his employment in calling Mr. Chase a fraud over the filing of his workers' compensation claim, which was approved by the federal government and uncontested by Mr. King and by USPS.

159.    Mr. King was acting outside the scope of his employment in calling Mr. Chase a fraud over his request for FMLA leave, which was approved by the federal government and uncontested by Mr. King and by USPS.

160.   Mr. King's job did not require him to get on the loudspeaker at work and insult his subordinates because they were injured on the job.

161.   The defendant acted negligently in failing to take reasonable actions to determine whether or not his statements that Mr. Chase had engaged in fraud, filed a false workers' compensation claim, and had taken advantage of FMLA leave without a legitimate need to do so were true.

162.   The defendant acted recklessly and with no regard for the truth of his statements about Mr. Chase even though he had or reasonably should have had serious doubts as to the truth of the statements.

163.   The defendants acted recklessly in making the above statements over the loudspeaker at work in the expectation that the statements would be published to Mr. Chase's co-workers, union members, and postal customers in the public lobby and widely disseminated.

164.   Mr. Chase was harmed in his personal capacity and in his professional and business capacities by the defendant's statements about him. He suffered emotional distress and damage to his good name and reputation.

**WHEREFORE**, the plaintiffs respectfully request that this Court declare that the defendants violated federal and state law and order:

a.     that the defendants cease and desist from any further retaliatory actions;

b.      that the plaintiff be reinstated to his former position with

        USPS;

c.      that the plaintiff be compensated for any loss of wages, back

        pay, and/or benefits incurred as a result of the unlawful acts;

d.      that the plaintiff be compensated for any future loss of wages,

        front pay, and/or benefits incurred as a result of the unlawful

        acts;

e.      that the plaintiff be awarded an amount of money which will

        fairly compensate him for his emotional and physical pain and

        suffering and for damage to his reputation and earning

        capacity;

f.      that the defendants pay the plaintiff's costs and attorney's fees

        resulting from this action;

g.      that the defendants pay the plaintiff's interest;

h.      that the defendants be ordered to pay the plaintiff

        punitive/liquidated/multiple damages; and

i.      such additional relief as may be just and proper and/or will

        make the plaintiff whole, including but not limited to equitable

        relief, as the Court deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all applicable issues.

Respectfully submitted,

June 29, 2012

Robert Chase,
Plaintiff
by his attorney,


/s/ Lori A. Jodoin
Lori A. Jodoin, Esq., BBO# 655840
Lori@theemploymentlawyers.com
Rodgers Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010