UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT CHASE,                        )
                                     )
            Plaintiff,               )     CIVIL ACTION NO.
                                     )     12-11182-DPW
                                     )
        v.                           )
                                     )
UNITED STATES POSTAL SERVICE,        )
MICHAEL KING and                     )
THE UNITED STATES,                   )
                                     )
            Defendants.              )


MEMORANDUM AND ORDER
November 4, 2013


        Plaintiff Robert Chase brings this action against defendants
United States Postal Service ("USPS") and its employee supervisor
Michael King, alleging violations of the Family and Medical Leave
Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, and various intentional
torts arising out of the termination of his employment by USPS.

        Specifically, Mr. Chase asserts claims for (1) interference
with his use of the FMLA, in violation of 29 U.S.C. § 2615; (2)
retaliation for taking FMLA leave, in violation of 29 U.S.C. §
2615; (3) intentional interference with advantageous business
relations; (4) intentional infliction of emotional distress; and
(5) defamation.  The defendants have moved for summary judgment
as to all counts.  For the reasons set forth below, I will grant
the defendants' motion for summary judgment as to all claims

except those for FMLA retaliation by the USPS and Mr. King.

## I. BACKGROUND

***A.  Facts***

Viewing the evidence in the light most favorable to the plaintiff, the record before me discloses the following.

<u>1.</u>  <u>The Plaintiff's Work and Leave History</u>

Robert Chase began working as a letter carrier for USPS in 1997.  Mr. Chase worked at several other locations before transferring to the Brookline, Massachusetts Post Office in 2002 or 2003.  Throughout his fourteen year career with USPS, Mr. Chase's work performance was satisfactory or above.  He was punctual, reliable and attentive to his job, and prior to the events giving rise to this lawsuit, he was never disciplined nor subject to any corrective action.

Mr. Chase's brother, Michael Chase ("Michael"), began working as a letter carrier in 1998, and transferred to the Brookline Post Office sometime between 2003 and 2005.

Defendant Michael King has worked for USPS since 1988.  He served in the position of manager at the Brookline Post Office from February 2005 until February 2011, and therefore was the Chase brothers' manager at all times relevant to this lawsuit. Mr. King admitted in his deposition that he did not have any issue with Mr. Chase's job performance as a letter carrier.

In September 2006, Mr. Chase injured his knee on the job and

was out of work for about a week.[1]  In November 2006, a few months after Mr. Chase returned to work, Mr. King got on the public address system at the Brookline Post Office and said: "Will Bob Mr. Chase, the injury fraud specialist, please report to the office."  After making the announcement and off of the public address system, Mr. King laughed.  The Chief Shop Steward (union representative) for the Brookline Post Office, Joseph DeMambro, witnessed this incident.  Mr. DeMambro regarded Mr. King's action as inappropriate.  According to Mr. DeMambro, over one-hundred employees and potentially some postal customers may have heard the announcement.

On July 21, 2010, Mr. Chase was involved in a motor vehicle accident while on duty.  Mr. Chase's vehicle was parked when it was struck by another vehicle driven by an elderly woman who had fallen asleep at the wheel.  Mr. King responded to the scene and observed the severity of the accident.  Mr. King later testified in his deposition that upon seeing the damage to the vehicles, he expected that Mr. Chase would have been injured.  The other driver died as a result of the accident.  Mr. Chase was treated at the hospital and released the same day, having been diagnosed with a sprained shoulder and damaged rotator cuff.

According to Mr. DeMambro, Mr. King pressured him to encourage Mr. Chase not to file a worker's compensation claim so

---

[1]  This period of leave was not designated as FMLA leave.

that the injury would not show up in the statistics for the Brookline branch; these were statistics on which Mr. King's job performance, pay, and bonuses were measured.[2]  Shortly after his injury, Mr. Chase nevertheless submitted a claim for worker's compensation leave and benefits, which was approved.

For the first forty-five days after his injury, Mr. Chase was paid by USPS.  Beginning September 7, 2010, Mr. Chase received workers' compensation benefits, which amounted to two-thirds his salary plus health insurance.  Mr. Chase also applied for leave under the FMLA to run concurrently with his worker's compensation leave.  His request was granted retroactive to the date of his injury.  Mr. King received a copy of Mr. Chase's FMLA approval notice.  The twelve weeks of FMLA leave to which Mr. Chase was entitled for calendar year 2010 expired on October 12, 2010.  When the new year began, he became eligible to take as much as another twelve weeks of FMLA leave.  The twelve weeks of FMLA leave to which Mr. Chase was entitled in 2011 expired no later than March 26, 2011.  With respect to this second period of FMLA leave, Mr. King did not know it had been designated as such.

Mr. King frequently expressed his concern to Mr. DeMambro over how the statistics for the branch and for himself were

---

[2]  For purposes of summary judgment, the defendants accept as true that Mr. DeMambro asked Mr. Chase not to file a worker's compensation claim, but deny that Mr. King pressured Mr. DeMambro to do so.  The defendants also deny that injury statistics affected Mr. King's compensation.

negatively impacted by injured employees out on medical leave and workers' compensation. Mr. King also told Mr. DeMambro several times that he wanted to avoid having to explain injuries during calls with the district Postmaster because they were several hours long and were "pure torture." Mr. Chase contends that Mr. King held a preconceived notion that employees who were injured on the job or required medical leave were faking their conditions or injuries or that they were liars, and that Mr. King would frequently withhold sick pay from employees in violation of collective bargaining agreements.

When Mr. Chase came into the Brookline branch to file his injury paperwork at the end of July or beginning of August 2010, Mr. King made another announcement over the loudspeaker directed at Mr. Chase. Mr. King announced: "There's a job posted on the bulletin board for an injury compensation specialist since you're the biggest fraud when it comes to injuries." There was in fact a job posted on the bulletin board for an "injury compensation specialist." The announcement was heard by Mr. Chase's co-workers and possibly by postal customers in the lobby. On another occasion, Mr. King asked Mr. DeMambro whether Mr. Chase was giving advice to a co-worker who had been injured on the job, expressing his belief to Mr. DeMambro that Mr. Chase was the "biggest fraud when it comes to workers' comp."

2.  Mr. Chase's Criminal Proceedings and Related USPS Action

On September 18, 2010, Brookline police arrested Mr. Chase and his brother Michael for possession of cocaine with intent to distribute.  The arrest occurred at Michael's apartment.  Neither Mr. Chase nor Michael was on-duty at the time of the arrest.

The police report indicates that police visited Michael's apartment to investigate a possible incident of domestic abuse involving Michael and his girlfriend.  Officers knocked on the apartment door and Michael let them in.  Once inside, officers observed Mr. Chase walk over to a table in the middle of the apartment (which was only 500 square feet) and grab a clear plastic baggie filled with a substance believed to be cocaine.  One of the officers ordered Mr. Chase to move away from the table and drop the baggie.  Mr. Chase pointed to the baggie and said "That's his" (presumably referring to his brother Michael).  Another officer indicated to Michael that he believed the substance in the bag to be cocaine.  Michael denied the bag belonged to him, and denied that there were any more drugs in the apartment.  Michael declined to consent to a search of the apartment.

After placing both men under arrest, officers recovered $387 and a straw of the variety commonly used to ingest narcotics, both of which were located next to the sink.  Michael appeared to be under the influence of cocaine but, in an interview with

police, denied that he had possessed or consumed any cocaine.

Police later executed a search warrant at the apartment and recovered a safe located in a closet that was emitting a narcotic odor (detected by a drug-sniffing canine), as well as a plate located inside a kitchen drawer containing what appeared to be lines of cocaine. Inside the safe, officers found several small bags of pills, a clear bag containing approximately twelve grams of a substance believed to be cocaine, a clear bag containing blue powder, and a digital scale.[3] As a result of his arrest, Mr. Chase was charged with possession of cocaine with intent to distribute, in violation of Mass. Gen. Laws ch. 94C, § 32A (a), and conspiracy to violate the drug laws, in violation of Mass. Gen. Laws ch. 94C, § 40. Michael was charged separately.

Shortly thereafter, Mr. King became aware that Mr. Chase and his brother Michael had been arrested. Mr. King searched the internet and found a *Brookline Tab* article reporting the arrest and the fact that Mr. Chase and his brother were letter carriers in Brookline. The article reported details contained in the police report, including that Mr. Chase had allegedly grabbed a plastic bag containing what was believed to be cocaine off the table, and that there was nearly $400 and other drug-related

---

[3] Although Mr. Chase purports to dispute the accuracy of the police report, he does not explain in what respects he disagrees with the report, nor does he offer any competing version of the events leading to his arrest.

paraphernalia found at the scene. After the article was
published, a postal customer called Mr. King to ask if her mail
was safe. Mr. King asked the USPS Office of the Inspector
General to obtain a copy of the police report, which Mr. King
read.

Mr. King stated in his deposition that after reading the
*Brookline Tab* article and the police report, he was concerned
with the seriousness of the crimes with which Mr. Chase and his
brother were charged, and the negative publicity the incident
generated for the Brookline Post Office. In response, Mr. King
made the decision to place Michael Chase on emergency off-duty
status in accordance with the applicable collective bargaining
agreement between USPS and the letter carriers' union. Mr. King
did not take similar action with respect to Mr. Chase, although
the parties dispute whether this decision was due to the fact
that Mr. Chase was on workers' compensation leave at the time and
was therefore already off-duty. However, because Mr. Chase was
not placed on emergency off-duty status, he, unlike his brother,
was allowed in the Brookline Post Office and on postal premises.

During the fall and early winter of 2010, Mr. Chase
frequently visited the Brookline Post Office to submit injury
paperwork, discuss union matters, and communicate with Mr. King.
Mr. Chase and Mr. King had many conversations about the arrest,
and Mr. King continued to pressure Mr. Chase to return to work

even after the arrest.  On one occasion, Mr. King told Mr. Chase

that he would "sic Jeff Powers from [the Office of the Inspector

General]" on Mr. Chase if he did not get himself medically

cleared to return to work, and on another, Mr. King said: "I

really need you.  I'm four people down."  Mr. Chase contends that

when he explained his side of the story concerning the arrest,

Mr. King believed his explanation that he did not use drugs, and

agreed that the charges against him were baseless and would or

should be dismissed.  Mr. King only stopped communicating with

Mr. Chase about returning to work following a December 2010 phone

call in which Mr. King told Mr. Chase "go fuck yourself" after

Mr. Chase contacted him for help with an issue related to his

medical leave.

    In the ensuing months, Mr. King monitored the criminal cases

against the Chase brothers, both of which were repeatedly

continued.  Mr. King testified in his deposition and contends in

this action that eventually he felt that he could no longer

continue waiting for the criminal case against Mr. Chase to

resolve, because USPS requires that personnel actions be taken

within a reasonable amount of time after the underlying events.

On January 13, 2011, Mr. King sent Mr. Chase a letter scheduling

a pre-disciplinary interview ("PDI"),[4] "in regard to your arrest

---

[4] Although there is some dispute over the exact nature or
purpose of the PDI, both parties acknowledge that the PDI is the
first step in the formal discipline process, and that Mr. King

-9-

concerning drug related activities," for January 18, 2011. Central to his allegations in this lawsuit, Mr. Chase disputes that Mr. King's decision to commence the process of terminating him in January 2011, five months after his arrest, was genuinely motivated by concern stemming from that arrest.  Rather, Mr. Chase alleges that Mr. King used the drug arrest as pretext to terminate him for taking protected FMLA leave.

At Mr. Chase's request, the PDI was conducted over the telephone, with Mr. Chase, Mr. King, and Mr. DeMambro participating.  Mr. Chase was asked about the circumstances surrounding his arrest but generally declined to answer, citing advice of his criminal counsel.[5]

Following the PDI, and purportedly due to the seriousness of the criminal charges pending against Mr. Chase, the negative publicity surrounding the Brookline Post Office as a result the arrest, and Mr. Chase's refusal to answer questions in his PDI, Mr. King sought and received approval from his supervisor, William Downes, to remove Mr. Chase for unacceptable conduct.  On January 28, 2011, Mr. King sent a memorandum to the Postal

frequently referred to it as an employee's "day in court."

[5] Mr. Chase disputes that the questions and his answers at the PDI were accurately recorded, but does not explain in what ways the record is incorrect.  Mr. Chase further alleges that prior to the PDI, he had already met with Mr. King to discuss the police report with him, and spoken with him over the telephone concerning the arrest several times since September 2010.

Service's Office of Labor Relations asking them to prepare a notice of removal for Mr. Chase for "Failure to Perform Duties in a Satisfactory Manner."  Mr. King referenced Mr. Chase's arrest and refusal to answer questions at his PDI.

The removal notice, which was dated February 1, 2011, and signed by Mr. King, stated that Mr. Chase would be removed for "Failure to Perform Your Duties in a Satisfactory Manner," specifically citing Mr. Chase's arrest and refusal to answer questions during his PDI.  The notice stated: "Your actions in this matter are considered to be very serious," and cited two specific policies in the USPS Employee Labor Relations Manual: Section 665.25 (Illegal Drug Sale, Use, or Possession)) and Section 665.16 (Behavior and Personal Habits).[6]  The notice

---

[6] Those sections state as follows:

**665.25 Illegal Drug Sale, Use, or Possession:** The Postal Service will not tolerate the sale, possession or use of illegal drugs, while on duty or on postal premises. Employees found to be engaged in these activities are subject to discipline, including removal and/or criminal prosecution where appropriate.

**665.16 Behavior and Personal Habits:** Employees are expected to conduct themselves during and outside of working hours in a manner that reflects favorably upon the Postal Service. Although it is not the policy of the Postal Service to interfere with the private lives of employees, it does require that postal employees be honest, reliable, trustworthy, courteous, and of good character and reputation.  The Federal Standards of Ethical Conduct referenced in 662.1 also contain regulations governing the off-duty behavior of postal employees.  Employees must not engage in criminal, dishonest, notoriously disgraceful, immoral, or other conduct prejudicial to the Postal Service.

explained that Mr. Chase would be removed on March 3, 2011, or later if his union filed a grievance on his behalf.

### 3. Grievance and Arbitration Proceedings

In response to the notice of removal, Mr. Chase's union filed a grievance under the collective bargaining agreement, alleging that his removal was without just cause. As part of the grievance process, Mr. Chase was asked to submit a statement. In response, Mr. Chase submitted a statement that referred all questions about his criminal case to his attorney, and asserted only that "any allegation regarding potential criminal activity is completely unfounded."

After the grievance was rejected, Mr. Chase's union told him that it had worked out a deal with USPS in which Mr. Chase could accept a fourteen-day suspension in lieu of his removal if his brother Michael – who also had been issued a notice of removal and for whom the union also was pursuing a grievance – were to resign. The union recommended that Mr. Chase accept the offer. Michael, however, refused to resign, and Mr. Chase rejected the offer. The parties dispute whether Mr. King had any involvement in the decision to make this offer.

On August 31, 2011, the conspiracy charge against Mr. Chase was dropped, the possession with intent to distribute charge was reduced to simple possession, and Mr. Chase was placed on pre-trial probation, subject to random drug testing, for one year.

An arbitration hearing was conducted on September 16, 2011 to determine whether Mr. Chase's notice of removal had been issued for "just cause." The only evidence Mr. Chase presented to the arbitrator concerned the disposition of his criminal case, although he may have misrepresented that the charges had been "dropped" or "dismissed." During the arbitration, a representative for the Postal Service, Michael DeMatteo, made a statement along the lines of: "Don't let Mr. Chase fool you; he has been living a great, tax free life while the rest of us have to come to work. For all he [presumably, Mr. Chase] knows, all his paperwork is fraudulent."[7] On September 30, 2011, the arbitrator issued a written decision upholding Mr. Chase's removal. The arbitrator specifically found that USPS had shown by clear and convincing evidence that Mr. Chase had possessed a Class B illegal drug, which violated a reasonable and equitably enforced USPS disciplinary rule.

Mr. Chase's termination from USPS became effective on September 30, 2011. As of the date of his termination, Mr. Chase had not yet returned to work from his accident. In his deposition, Mr. Chase testified that the earliest he was

---

[7] The parties dispute the intended meaning of this statement. Mr. Chase claims it evidences USPS' intent to terminate him because of his injury leave. The defendants counter that it was "a response to an income-related misrepresentation by [Mr. Chase] during the arbitration proceeding." The hearing was not transcribed or recorded.

physically able to return to work (with some limitations on
activity) was November 8, 2012.

## B.  *Procedural History*

Mr. Chase commenced this action in June 2012, alleging that
the defendants, through Mr. King, used Mr. Chase's drug arrest as
a pretext to terminate him for taking protected FMLA leave.  In
addition, Mr. Chase seeks to hold Mr. King liable for defamation
and intentional infliction of emotional distress arising from
statements Mr. King made suggesting Mr. Chase was faking his
injuries and fraudulently taking medical leave, as well as
intentional interference with advantageous business relations for
allegedly discharging Mr. Chase after he refused to procure his
brother's resignation.

In August 2012, the Attorney General of the United States
certified that Mr. King had acted within the scope of his
employment for purposes of the non-FMLA intentional torts (Counts
III-V), and the United States substituted itself as the sole
defendant pursuant to 28 U.S.C. § 2679(d)(1) as to those counts.
Defendants then moved to dismiss Count III (intentional
interference) and Count V (defamation) on the grounds that Mr.
King was acting within the scope of his employment with respect
to those claims, and the that Federal Tort Claims Act does not
waive sovereign immunity for either tort.  Defendants also moved
to dismiss Count IV (intentional infliction of emotional

distress) on the ground that Mr. Chase failed to exhaust administrative remedies as required under the FTCA for that claim.  For his part, the individual defendant, Mr. King, moved to dismiss Counts I and II, arguing that public employees may not be held individually liable for violations of the FMLA.  I denied the motions to dismiss in order to address the issues presented therein on a summary judgment record.  Now before me are motions by the defendants for summary judgment against all counts.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The burden is on the nonmoving party "to point to specific facts demonstrating that there is, indeed, a trialworthy issue." *Id.*  To survive a motion for summary judgment, the nonmoving party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson* v. *Liberty Lobby, Inc.*, 477

-15-

U.S. 242, 256 (1986).  The court must view "the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor," *Griggs-Ryan* v. *Smith*, 904 F.2d 112, 115 (1st Cir. 1990), in order to determine "whether the evidence presents a sufficient disagreement ... or ... is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. ANALYSIS

### A.    *FMLA claims (Counts I and II)*

The FMLA, 29 U.S.C. § 2601 *et seq.*, grants two distinct types of rights to eligible employees: "prescriptive" rights and "proscriptive" rights.  *Hodgens* v. *General Dynamics Corp.*, 144 F. 3d 151, 159-160 (1st. Cir. 1998).

Among the prescriptive rights it creates are that eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per calendar year when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position."  29 U.S.C. § 2612(a)(1)(D). "Following a qualified absence, the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority."  *Hodgens*, 144 F.3d at 159 (citing 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c)).  The First Circuit has observed that "[t]hese rights are essentially prescriptive,

-16-

'set[ting] substantive floors' for conduct by employers, and creating 'entitlements for employees.'" *Hodgens*, 144 F.3d at 159 (citing *Diaz* v. *Fort Wayne Foundry Corp.*, 131 F.3d 711, 712-12 (7th Cir. 1997). "As to these rights therefore, the employee need not show that the employer treated other employees less favorably, and an employer may not defend its interference with the FMLA's substantive rights on the ground that it treats all employees equally poorly without discriminating." *Id.* To meet his or her burden in an interference with a substantive prescriptive rights claim, a plaintiff need only show an entitlement to the disputed leave, no showing as to employer intent is required. *Colburn* v. *Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005). "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave." *Hodgens*, 144 F.3d at 159.

The proscriptive rights of the FMLA expressly protect employees against retaliation for invoking their prescriptive rights. *Hodgens,* 144 F.3d at 159 (citing 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220 (1997)). 29 U.S.C. § 2615(a)(1) provides: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. §

2615(a)(2) further provides: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  This means that employers are prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  *Hodgens*, 144 F.3d at 160 (quoting 29 C.F.R. § 825.220(c)).

Where an employee alleges violations of the proscriptive rights under the FMLA, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate non-discriminatory reason."  *Hodgens,* 144 F.3d at 160.  In such cases, the First Circuit has adopted a familiar framework to analyze "the tricky issue of motivation;" this framework is analogous to that used in cases involving other types of discrimination, such as discrimination under Title VII of the Civil Rights Act of 1964. *Id.; see McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 800-06 (1973) (discrimination under Title VII); *DeNovellis* v. *Shalala*, 124 F.3d 298, 308 (1st Cir. 1997) (discrimination under ADEA); *Katz* v. *City Metal Co.,* 87 F.3d 26, 30 n.2 (1st Cir. 1996) (discrimination under ADA).

Under the framework first articulated in *McDonnell Douglas*, a plaintiff employee bears the initial burden of adducing

sufficient evidence to establish a prima facie case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802; *Hodgens,* 144 F.3d at 160. If the employee does so, the burden then shifts to the employer "'to articulate some legitimate, non-discriminatory reason for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." *Hodgens*, 144 F.3d at 160 (quoting *McDonnell Douglas*, 411 U.S. at 802). The employer must, through the introduction of admissible evidence, provide an explanation that is legally sufficient to justify a judgment for the employer. *Id.* (citing *Texas Dep't of Community Affairs* v. *Burdine,* 450 U.S. 248, 255 (1981)). "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." *Id.* Even where the employer has successfully shifted the burden back to the employee, "evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual." *Id.* (citing *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 511 (1993)).

To make out a prima facie case for FMLA-based retaliation, the employee must demonstrate that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *Hodgens*, 144 F.3d at 160, (citing *Randlett* v. *Shalala*, 118 F.3d 857, 862 (1st Cir. 1997))

In practice, the distinction between claims alleging interference with the substantive rights provided under the FMLA, and claims alleging retaliation for exercising those rights, is not always clear. *See Colburn*, 429 F.3d at 330-32. The ambiguity derives, at least in part, from the fact "there is no clear demarcation in § 2615 between what is 'interference' and what is 'discrimination,' and the terms overlap in some situations." *Id.* *See, e.g. Conoshenti* v. *Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143-47 & n.9 (3d Cir. 2004); *Bachelder* v. *Am. W. Airlines*, 259 F.3d 1112, 1124 n.10 (9th Cir. 2001).[8] "[C]ourts have disagreed about whether 'interference' refers to a category of claims separate and distinct from those involving

---

[8] As the First Circuit has explained, § 2615(a)(1) expressly prohibits actions by "any employer to interfere with, restrain or deny the exercise of" the rights created under the FMLA. *Colburn,* 429 F.3d at 331. Although § 2615(a) makes no reference to "retaliation," the First Circuit has interpreted that section, and more specifically the interpretive regulation accompanying it, as "unambiguously" creating a cause of action for retaliation. *Id.* at 331 (citing C.F.R. §825.220(c)).

retaliation, or whether it describes a group of unlawful actions, of which retaliation is a part." *Colburn*, 429 F.3d at 331 (citing *Bachelder*, 259 F.3d at 1124 & n.10).

As the First Circuit has acknowledged, "[t]he term 'interference' may, depending on the facts, cover both retaliation claims . . . and non-retaliation claims." *Colburn,* 429 F.3d at 331 (citing *Hodgens*, 144 F.3d at 159-60 & n.4; *Conoshenti*, 364 F.3d at 142-43). Given the disparate standards of proof applied to the two types of claims, the distinction is not merely academic. *See id.* at 330-32. The First Circuit, however, has made clear that the question whether a FMLA-based claim is properly treated as an interference-type or retaliation/discrimination-type claim does not turn on which statutory section is pled, but rather "on the nature of the facts and the theory of the case." *Id*. at 331.

Turning to the complaint, it is clear that Mr. Chase pleads claims for both interference (Count I) and retaliation (Count II), arising from the same set of facts. I will address those claims in turn.

### 1. Interference Claim (Count I)

Mr. Chase claims that his substantive, prescriptive rights under the FMLA were unlawfully interfered with when USPS issued the notice of removal on February 1, 2011, during his 2011 FMLA leave period. The parties do not dispute that Mr. Chase was on

FMLA-protected leave on February 1, 2011.  However, the parties
do dispute whether the issuance of the notice of removal
constitutes an interference with or deprivation of his right to
take twelve weeks of FMLA leave in 2011, given that he was not
actually terminated until September 30, 2011 (well after his
twelve weeks expired).  I need not resolve this question.

By Mr. Chase's own admission, he was not physically able to
return to work until at least November 8, 2012, more than a year
after his termination and well after the expiration of his 2011
FMLA leave period.  Accordingly, Mr. Chase's interference claim
must fail, because USPS was under no obligation to reinstate him
where he remained injured and "unable to perform an essential
function of [his] position" following the expiration of his FMLA
leave period.  *Colburn*, 429 F.3d at 332 (citing C.F.R.
§825.14(b)) ("plainly correct" to dismiss interference claim of
employee who was fired while on FMLA leave, where employee
testified in deposition that he was unable to return to work
until well after expiration date of FMLA leave).  The defendants
are therefore entitled to summary judgment on Count I.

> 2.  Retaliation Claim (Count II)

As to Mr. Chase's claim that he was discharged in
retaliation for taking protected FMLA leave, the defendants argue
that they are entitled to summary judgment because no reasonable
trier of fact could conclude that Mr. Chase was terminated

because he took FMLA leave, particularly where an arbitrator ruled that USPS had just cause to terminate him arising from his drug arrest. The defendants concede that Mr. Chase has made out a prima facie case of FMLA retaliation, but argue that they have shifted the burden back to Mr. Chase by producing evidence of a legitimate, non-retaliatory reason - his drug arrest - for terminating Mr. Chase. Mr. Chase does not contest that he bears the burden, and devotes the bulk of his argument attempting to demonstrate pretext.

### a. Causation Standard

I address at the outset a dispute that has arisen regarding the type of causation a plaintiff must show to prove an FMLA retaliation claim. The defendants contend that Mr. Chase must prove that he would not have been terminated *but for* his taking protected FMLA leave, while Mr. Chase appears to contend that he need only demonstrate that his taking of FMLA leave was a "motivating factor" in the decision to terminate him. This dispute stems, at least in part, from a Supreme Court decision last term, *University of Tex. Sw. Med. Ctr.* v. *Nassar*, 133 S. Ct. 2517, 2533 (2013), holding that Title VII retaliation claims "must be proved according to traditional principles of but-for causation . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* Because the

framework for analyzing FMLA retaliation claims is adopted from
the Title VII arena, *see Hodgens*, 144 F.3d at 60, the defendants
argue that following *Nassar*, plaintiffs alleging FMLA retaliation
must establish but-for causation.

The handful of courts that have had the occasion to consider
the impact of *Nasser* on FMLA retaliation claims have generally
avoided answering the question, with none concluding that *Nassar*
changed the causation standard for FMLA retaliation claims.  *See
Ion* v. *Chevron USA, Inc.*, 2013 WL 5379377 at *7 n.11 (5th Cir.
Sept. 26, 2013) (concluding genuine issue of material fact
existed regardless of which standard were to be applied); *Chaney*
v. *Eberspaecher NA*, 2013 WL 3381437 at *1 n.1 (E.D. Mich July 8,
2013) (stating "the *Nassar* decision, while informative, did not
change any applicable standards [in FMLA cases]); *see also Ford*
v. *Berry Plastics Corp.*, 2013 WL 5442355 at *10 n.8 (D. Md. Sept.
27, 2013) (noting that even if *Nasser* applied to FMLA claims, a
plaintiff at the summary judgment stage is "not required to
conclusively establish the causal connection required to
ultimately prevail.").

The *Nassar* holding derives from what the Court felt was a
"deliberate" "structural choice[]" by Congress to distinguish
Title VII status-based discrimination claims, in which the
plaintiff alleges the employer discriminated against him because
of his protected status, and Title VII retaliation claims, in

which the plaintiff alleges that the employer retaliated against

him for complaining of discriminatory treatment. *See Nassar*, 133

S. Ct. at 2529. Previously, in *Price Waterhouse* v. *Hopkins*, the

Supreme Court had interpreted Title VII's prohibition regarding

discrimination "against any individual . . . *because of* race,

color, religion, sex, or national origin," to require a plaintiff

to show only that "one of the prohibited traits was a

'motivating' or 'substantial factor' in the employer's [adverse]

decision." 490 U.S. 228, 258 (1989) (emphasis added). Following

that decision, Congress passed the Civil Rights Act of 1991, 105

Stat. 1071, which amended Title VII to (among other things)

codify the "motivating factor" standard from *Price Waterhouse*.

*See Nassar*, 133 S.Ct. at 2526.

The Supreme Court decided in *Nassar*, however, that when

Congress codified that standard, it was incorporated only into

the section prohibiting status-based discrimination, 42 U.S.C.

§2000e-2(m), and *not* into the section prohibiting retaliation, 42

U.S.C. §2000e-3(a). *Id*. at 2526-2527. Accordingly, the Court

concluded that in the absence of an indication that the

"motivating factor" standard was intended to apply to retaliation

claims, the ordinary meaning of the phrase "because," as it

appears in the anti-retaliation provision, compels the conclusion

that "Title VII retaliation claims require proof that the desire

to retaliate was the but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528.[9]

On the one hand, the Supreme Court's decision in *Nassar* appears to rest on Title VII's statutory scheme (and that of the ADEA at issue in *Gross*) and the specific text of its retaliation provision. In contrast, as the Fifth Circuit observed, "[t]he relevant provision of the FMLA uses the word 'for' in lieu of the phrase 'because of,' the language contained in both the Title VII provision at issue in *Nassar . . .* and the ADEA provision at issue in *Gross*." *Ion*, 2013 WL 5379377 at *7 n.11.

The United States Department of Labor has interpreted this provision to prohibit employers from "us[ing] the taking of FMLA leave *as a negative factor* in employment actions." 29 C.F.R. § 825.220 (c) (emphasis added); *see Ion*, 2013 WL 5379377 at *7 n.11. However, the Supreme Court in *Nassar* expressly declined to

---

[9] The Supreme Court reached this result in a somewhat circular fashion. It first concluded in *Gross* v. *FBL Financial Servs.*, Inc. 557 U.S. 167 (2009), that because the "motivating-factor" standard was not an "organic part of Title VII," it could not be read into the section of the Age Discrimination and Employment Act ("ADEA") prohibiting discrimination based on age, *see* 29 U.S.C. § 623(a)(1), and accordingly, that section's use of the familiar "because of" language mandated proof of but-for causation. *See Nassar,* 133 S.Ct. at 2527-28 (citing *Gross*, 557 U.S. at 176, 178 n.5). Then, in *Nassar*, the Court concluded that, "[g]iven the lack of any meaningful difference between the text in [Title VII's anti-retaliation provision] and the one in *Gross*, the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 2528 (citing *Gross*, 557 U.S. at 176).

grant deference to "longstanding agency views" of the Equal
Employment Opportunity Commission that Title VII retaliation
claims were subject to a motivating-factor causation standard.
*See Nassar*, 133 S. Ct. at 2533.

The *Nassar* Court also hinted at policy-based underpinnings
for its decision, observing that "[t]he proper interpretation and
implementation of [the Title VII provision at issue] and its
causation standard have central importance to the fair and
responsible allocation of resources in the judicial and
litigation systems.  This is of particular significance because
claims of retaliation are being made with ever increasing
frequency."  *Id*. at 2531.

Finally, and perhaps most importantly, the Supreme Court in
*Nassar* observed that "[i]n the usual course", "causation in fact
. . . is a standard requirement of any tort claim . . .
includ[ing] federal statutory claims of workplace
discrimination," and "this standard requires the plaintiff to
show 'that the harm would not have occurred' in the absence of –
that is, but for – the defendant's conduct.  *Nassar*, 133 S. Ct.
at 2452-25 (quoting Restatement of Torts §§ 431 and 432).

For several reasons then, it is not entirely clear that the
Supreme Court would distinguish the FMLA's retaliation provision
based on its use of "for" instead of "because of," or defer to
agency interpretations of that provision.  *See id.* at 2547

(Ginsburg, J., dissenting) ("Indeed, the Court appears driven by a zeal to reduce the number of retaliation claims filed against employers.").

When the First Circuit decided *Hodgens* in 1998, it could hardly have foreseen that its general analogy between FMLA and Title VII claims should incorporate the nuanced, bifurcated causation analysis developed by the Supreme Court over a decade later in *Nassar*. In fact, even following the establishment of the "motivating factor" standard by *Price Waterhouse*, it appears that the First Circuit regarded but-for causation and mixed-motive causation to be essentially the same in the context of employment discrimination cases. *See Tatro* v. *Kervin*, 41 F.3d 9, 18 (1st Cir. 1994) (observing "This Circuit has consistently applied a 'but for' standard in mixed motive employment discrimination cases" and stating that, in an analogous § 1983 action, "plaintiff need only show that the officer's intent or desire to curb the expression was the *determining* or *motivating* factor in making the arrest, in the sense that the officer would not have made the arrest 'but for' that determining factor."). In short, the First Circuit, at least before *Nassar*, seems to have collapsed "motivating factor" causation into "but-for" causation."

More recently, however, The First Circuit in *Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012), held that but-for

-28-

causation applies to retaliation claims under the Rehabilitation
Act, 29 U.S.C. §§ 701-7961. Although *Palmquist* was issued almost
one year prior to *Nassar,* much of its analysis appears to
anticipate *Nassar*. The take-away from *Palmquist*, as with *Nassar*,
is that if Congress intended a "motivating-factor" causation
standard to apply to a particular statutory discrimination or
retaliation claim, it would have explicitly written that standard
into the statute. *See Palmquist*, 689 F.3d at 73-74, 76. Where
instead, the Rehabilitation Act adopted its causation standard
from the Americans with Disabilities Act (ADA), 42 U.S.C. §§
12111-12213, and the ADA uses the word "because," normal but-for
causation will apply. *Palmquist*, 689 F.3d at 73. The fact that
Congress contemporaneously amended Title VII and the ADA in 1991,
but chose to insert the "motivating factor" language into only
one section of Title VII, and not at all in the ADA, further
compels this result. *Id.; see Nassar* 133 S. Ct. at 2529. As to
the FMLA, which was enacted in 1993, two years after the
amendment of Title VII and the ADA, the same argument could
easily be made.

Here, I find, even after considering *Nassar*, *Palmquist* and
the prospects for the development of more rigorous distinctions
between "motivating factor" and "but-for" causation in their
wake, that irrespective of which standard is to be applied, Mr.
Chase has adduced sufficient evidence to survive summary judgment

on his retaliation claim. The evidence in the summary judgment record, when viewed in the light most favorable to Mr. Chase, is sufficient to permit a reasonable trier of fact to conclude that Mr. King made the decision to terminate Mr. Chase for reasons that had nothing to do – except pretextually – with his arrest, but rather in retaliation for taking leave – leave that the defendants do not dispute was protected by the FMLA. In short, the record before me would permit, but does not necessarily compel, the conclusion that Mr. Chase would not have been terminated but for retaliation against him for his making use of his FMLA prescriptive rights.

> b.  *Evidence of Pretext*

The First Circuit has observed that "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens,* 144 F.3d at 167 (quoting *Stephanischen* v. *Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983). That said, "summary judgment is not 'automatically preclude[d]' even in cases where elusive concepts such as motive or intent are at issue." *Id.* (quoting *DeNovellis*, 124 F.3d at 306. Yet, where the non-moving party has produced more than "conclusory allegations, improbable inferences, and unsupported

speculation," trial courts "should use restraint where
discriminatory animus is in issue." *Id.* (internal quotations
omitted). Irrespective of whether because of the lack of jury
trial I may ultimately become the fact finder in this dispute,[10]
my role in summary judgment practice "is not to weigh the
evidence and determine the truth of the matter, but to determine
whether there is a genuine issue for trial." *Anderson* v. *Liberty
Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The First Circuit has recognized that "one way an employee
may succeed is to show 'such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them unworthy of
credence and [with or without additional evidence and inferences
properly drawn therefrom] infer that the employer did not act for
the asserted non-discriminatory reasons.'" *Hodgens,* 144 F.3d at
168 (quoting *Morgan* v. *Hilti, Inc.*, 108 F.3d 1319, 1323 (10th
Cir. 1997)).

Of particular relevance here, "[s]tatements by supervisors
carrying the inference that the supervisor harbored animus
against protected classes of people or conduct are clearly

---

[10] The FMLA does not provide a right to a jury trial against
the federal government. *See Davis* v. *Henderson*, 2000 WL 1828476
at *2 (6th Cir. Dec. 4, 2000); *Steinhardt* v. *Potter*, 326 F. Supp.
2d 44, 450-453 (S.D.N.Y. 2004).

probative of pretext . . . even if that inference is not the only one that could be drawn from the comment." *Hodgens*, 144 F.3d at 171 (and cases cited). Mr. Chase has produced ample evidence of statements made by Mr. King suggesting that Mr. King harbored animus against employees taking injured leave, particularly for injuries that he viewed as illegitimate or exaggerated, and that he felt that Mr. Chase was a flagrant offender in this regard. In conjunction with the evidence that Mr. King repeatedly asked Mr. Chase to return to work even *after* learning of the details of his arrest and during the pendency of his criminal case, the timing of Mr. King's decision to initiate the discharge process – nearly five months after Mr. Chase's arrest and while Mr. Chase continued to be absent from work – would warrant a trier of fact weighing the credibility of the witnesses to conclude that Mr. King was simply fed up with Mr. Chase's leave-taking, which included a lengthy period of FMLA leave, and decided to use the arrest as an excuse to fire him.[11]

---

[11] I have not ignored the fact, which is undisputed, that Mr. King did not know that Mr. Chase's leave was administratively re-designated as FMLA leave beginning on January 1, 2011. The obvious significance of this fact is that it means Mr. King did not know Mr. Chase was on FMLA leave at the time he initiated discharge proceedings against him in February, 2011. While this fact certainly makes it a closer case, I do not think that it prevents a rational trier of fact from nonetheless concluding that Mr. King made the decision to terminate Mr. Chase in retaliation for taking the earlier period of FMLA leave, particularly where the timing of the discharge is not the sole factor on which Mr. Chase relies to demonstrate pretext.

Also in support of his claim of pretext, Mr. Chase has

offered evidence regarding three other employees, supervised by

Mr. King, who were arrested on drug related charges but who were

not terminated.  The defendants argue that none of the three is a

valid comparator because one "fell on his sword, admitting that

he committed the crime he was charged with, admitting his drug

addiction, and begging the Postal Service for help," and the

other two did not have their arrests publicized and the charges

against them were dismissed.[12]  Given the defendants' contentions

that Mr. Chase's termination was solely a result of his drug

arrest,[13] and in light of the fact that Mr. King's perspective on

_____

[12] To the extent Mr. Chase has sought to offer evidence of
additional comparators who were not supervised by Mr. King, I
have not considered this evidence in reaching my decision
regarding summary judgment.  Given the broad discretion that Mr.
Chase admits Mr. King had in making disciplinary decisions, I do
not find postal employees who worked for managers other than Mr.
King or those whose disciplinary actions were not reviewed by Mr.
King's supervisor, William Downes, to be valid comparators.  See
*Rodriguez-Cuervos* v. *Wal-Mart Stores, Inc.,* 181 F.3d 15 (1st Cir.
1999).  In this connection, however, I have authorized additional
discovery in anticipation of trial regarding comparative
sanctions for drug issues among those whose disciplinary actions
were subject to review by Mr. Downes.

[13] I note that although the record is replete with
suggestions – particularly in the form of arch statements made by
Mr. King – that Mr. Chase was faking or exaggerating his
injuries, or otherwise gaming the system, the defendants do not
challenge whether Mr. Chase had a qualifying injury or whether
his injury leave in the relevant periods was FMLA-protected.
This is thus not a case where the plaintiff employee was fired
after an investigation revealed cause to believe that the
employee was overstating the medical condition for which he was
taking FMLA leave.  *See Colburn*, 429 F.3d at 327-329.  Nor is it
a case where the defendant contends the plaintiff employee was

Mr. Chase's drug arrest is alleged to have changed abruptly for

reasons having nothing to do with that arrest, I find this

evidence provides additional support for Mr. Chase's FMLA

retaliation claim.[14]

<u>3.</u>   <u>Individual Liability of Mr. King under the FMLA</u>

Mr. King has moved to dismiss Counts I and II against him in

his individual capacity, arguing that the FMLA does not provide

for individual liability for public employees who otherwise

qualify as "employers" under the statute.  Neither the Supreme

---

terminated for taking non-FMLA protected medical absences in
addition to FMLA protected absences (even though Mr. Chase did in
fact do this).  *See Hodgens*, 144 F.3d at 165, 171-172.  The
defendants have maintained throughout that Mr. Chase was
terminated as a result of his arrest and the ensuing criminal
charges.  Therefore, the legitimacy of Mr. Chase's injury or his
continuing inability to work is not directly relevant to any
issues surrounding his retaliation claim.

[14]   The defendants argue that, where, in their view, I must
apply but-for causation to the retaliation claim, Mr. Chase
cannot possibly prove that he would not have been terminated but
for his taking FMLA leave, given that a labor arbitrator already
decided USPS had just cause to terminate him arising from his
drug arrest.  Putting aside the defendants collateral estoppel
argument, which I believe is misplaced, I note that, even if a
rigorous version of but-for causation is the correct standard to
apply, the question would be not whether the defendants *could*
have terminated Mr. Chase solely on the basis of his drug arrest,
but rather whether, in fact, they did.  *See Nassar*, 133 S. Ct. at
2525.  *See generally McDonnell Douglas*, 411 U.S. at 804 (employer
may not use an ostensibly legitimate reason for an adverse action
as a pretext for discrimination that is prohibited by statute).
To be sure, in some FMLA retaliation cases, the proffered reason
for the termination will be legitimate grounds for termination
because it was the actual motivation behind the decision to
terminate.  But there is a genuine issue of material fact in this
case whether that is what happened here.

Court nor the First Circuit has considered the issue, and the circuits that have considered it are split. The Third, Fifth and Eighth Circuits have concluded that a public employee may be held individually liable under the FMLA, *see Haybarger* v. *Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012); *Modica* v. *Taylor*, 465 F.3d 174, 188 (5th Cir. 2006); *Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002), while the Sixth and Eleventh Circuits have reached the opposite conclusion, *see Mitchell* v. *Chapman*, 343 F.3d 811, 829 (6th Cir. 2003); *Wascura* v. *Carver*, 169 F.3d 683, 686 (11th Cir. 1999).

Judge Tauro, the only Judge of this district to my knowledge who has considered the issue, agreed with those circuits that have imposed individual liability on public employees. *See Mason* v. *Mass. Dep't of Envt'l Prot.*, 774 F. Supp. 2d 349, 363 (D. Mass. 2011). Judge Tauro notes that the majority of district courts considering the issue have also held that the FMLA does impose individual liability on public officials. *See id.* at 361-62 & n.106 (surveying decisions).

Under the FMLA, only an "employer" may be sued by an aggrieved employee and held liable. 29 U.S.C. § 2617(a)(1) & (2). The issue before me thus largely revolves around the definition of "employer" under the FMLA, and whether that definition includes a supervisor employed by a public entity. That definition reads as follows:

**(4) Employer.**
    **(A) In general.**
    The term "employer"-
        (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
        (ii) includes-
            (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and
            (II) any successor in interest of an employer;
        (iii) includes any "public agency", as defined in section 3(x) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(x)); and
        (iv) includes the General Accounting Office and the Library of Congress.
    **(B) Public agency.**
    For purposes of subparagraph (A)(iii), a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce.

29 U.S.C. § 2611(4).

Although the FMLA's definition of "employer" is certainly not a model of clarity and the interpretation given by the minority of courts that support the defendants is not entirely illogical, I agree with the thoroughly reasoned opinion of Judge Tauro in *Mason* rejecting the minority interpretation and find that the majority position among the courts is more persuasive. *See Mason*, 774 F. Supp. 2d at 362-66.

Ultimately, the language of the statute itself provides the most convincing answer. The statute plainly includes in the definition of employer "any person who acts, directly or indirectly, in the interest of an employer to any of the

employees of such employer." § 2611(4)(A)(ii)(I). The statute further includes public agencies as employers. § 2611(4)(A)(iii). Therefore, if a public employee "acts, directly or indirectly, in the interest of an employer," he satisfies the definition of employer under the FMLA, and becomes subject to liability in his individual capacity. *Modica*, 465 F.3d at 184; *Darby*, 287 F.3d at 681 (definition of employer under FMLA "plainly includes persons other than the employer itself. We see no reason to distinguish employers in the public sector from those in the private sector.").

**B.    *Intentional Torts (Counts III-V)***

The defendants seek summary judgment as to Counts III-V, which allege that Mr. King committed the torts of intentional interference with advantageous business relations, intentional infliction of emotional distress, and defamation, on the grounds that Mr. King was acting within the scope of his employment with respect to all three alleged torts. Accordingly, they argue, the United States was properly substituted for Mr. King, and the counts must be dismissed because, with respect to Counts III and V, the United States has not waived its sovereign immunity from suit; and, with respect to Count IV, although the FTCA waives sovereign immunity for claims of intentional infliction of emotional distress, this court has no jurisdiction because Mr.

Chase failed to exhaust administrative remedies.[15]  Mr. Chase

concedes that if Mr. King was indeed acting within the scope of

his employment, then judgment must enter as to Counts III-V.

Where a plaintiff asserts that a defendant acted outside the

scope of his employment despite the Attorney General's

certification to the contrary, the plaintiff bears the burden of

proof.  *Davric Maine Corp.* v. *United States Postal Serv.*, 238

F.3d 58, 66 (1st Cir. 2001).  Because state law controls whether

a federal employee acts within the scope of his employment, I

apply Massachusetts law to this issue.  *Id.*

Under Massachusetts law, an employee's conduct falls within

the scope of his employment if (1) "it is the kind he is employed

to perform;" (2) "it occurs substantially within the authorized

time and space limits;" and (3) "it is motivated, at least in

part, by a purpose to serve the employer."  *Wang Labs, Inc.* v.

*Business Incentives, Inc.*, 501 N.E.2d 1163, 1166 (Mass. 1986)

---

[15] Before a plaintiff may file suit under the FTCA, he must
first file an administrative tort claim with the relevant federal
agency within two years after the claim accrues.  *See*
28 U.S.C. §§ 2401(b) and 2675(a).  Then he must file suit within
six months after the agency denies the administrative claim.  *See*
*id.* at 2401(b).  Satisfying these requirements is a
jurisdictional prerequisite to suit under the FTCA and is
"strictly enforced."  *Roman-Cancel* v. *United States*, 613 F.3d 37,
41 (1st Cir. 2010); *see Gonzalez* v. *United States*, 284 F.3d 281,
288 (1st Cir. 2002).  Compliance with the requirements is a
"condition of the United States' waiver of sovereign immunity,"
and accordingly, failure to comply is a "fatal defect."  *Velez-
Diaz* v. *United States*, 507 F.3d 717, 720 (1st Cir. 2007).  Mr.
Chase concedes that he has not satisfied the requirements of §§
2401(b) and 2675(a) with respect to Count IV.

(and cases cited).  *See* Restatement (Second) of Agency § 228.
The Supreme Judicial Court has observed that the scope of a
public employee's employment under G. L. c. 258, § 9 (the state
analogue to the FTCA) is determined by general respondeat
superior principles and "is not construed restrictively."  *Howard*
v. *Town of Burlington,* 506 N.E.2d 102, 105-06 (Mass. 1987).

Mr. Chase concedes that the second prong of the *Wang* test is
satisfied, where all the relevant conduct clearly took place
while Mr. King was on duty at the post office.  Additionally,
while he technically does not concede the first prong of the Wang
test, Mr. Chase offers only the bald assertion that "[Mr. King]
was not hired to humiliate employees who are injured on the job,"
and merely cites to two Massachusetts Superior Court cases
offering limited or no support for his argument.  Mr. Chase's
argument on this point fails.  With respect to the first prong,
"it is ordinarily the actual and customary, rather than formally
described, duties which determine scope of employment."  *Howard*,
506 N.E.2d at 105-106.   The question is not whether the employee
committed a tort, but whether he was performing the kind of work
he was hired to perform when he allegedly committed the tort.
*See Mangino* v. *United States*, 2006 WL 2033196 (D. Mass. July 19,
2006).

In rejecting a similar argument in *Mangino*, where the
plaintiff argued that the defendant doctors were not hired to

alter medical records fraudulently, Judge O'Toole observed that
"of course, though employers rarely authorize persons to [commit
torts], nevertheless the law clearly recognizes employer
liability for the [torts] of its employees." *Id.* at *3. As in
*Mangino*, where the defendants' job duties included maintaining
medical records, the question here is not whether Mr. King was
hired to humiliate his employees, but whether his "actual and
customary" job duties included making announcements over the
public address system and communicating with employees regarding
their injury status. *See id.; see also Davric*, 238 F.3d at 67
(applying Maine scope-of-employment test, which is identical to
Massachusetts law, and finding postal supervisor acted within
scope of employment when he made defamatory statement that Postal
Service had rejected plaintiff-owned property as site for new
postal facility because plaintiff was linked to organized crime
and "maybe even Jimmy Hoffa could be buried" there).

As to the third prong of the *Wang* test, the question is
whether Mr. King's conduct was "motivated, at least in part, by a
purpose to serve the employer." *Wang*, 501 N.E.2d at 166. The
question is not, as Mr. Chase variously characterizes it, whether
Mr. King "did not act in the best interests of his employer," or
whether "his motives were pure." Rather, Mr. Chase must prove
that Mr. King acted "from purely personal motives in no way
connected with the employer's interest." *Pinshaw* v. *Metropolitan*

*Dist. Comm'n*, 524 N.E.2d. 1351, 1356 (Mass. 1988) (quoting *W. Prosser & W. Keeton, Torts* 506 (5th ed. 1984)). Put another way, "[t]he fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Wang*, 501 N.E.2d at 1163.

Here, even when viewing all facts and drawing all reasonable inferences in the light most favorable to Mr. Chase, it would be impossible for a reasonable trier of fact to conclude that Mr. King was not motivated at least in part, by a purpose to serve his employer when he committed the alleged torts. Mr. King may have harbored a personal animus against injured employees, particularly Mr. Chase, and might even have been concerned primarily with how the injury statistics for the Brookline branch would affect his performance reviews and compensation.

Ultimately, however, it is clear that he acted, at least in part, from a desire to protect the interests of his employer against an employee who, in his view, was taking advantage of the system. It does not matter that Mr. King may have acted loutishly and/or overzealously in his pursuit of these interests, by allegedly defaming the plaintiff (Count V), inflicting emotional distress upon him (Count IV), or by attempting improperly to procure his and his brother's termination (Count III). *See, e.g. Davric*, 238 F.3d at 67 (individual defendant's

"avalanche of derogatory comments" and "series of highly defamatory charges" directed at plaintiffs and "made in a very angry fashion" not outside scope of employment even if not endorsed by employer); *Aversa* v. *United States*, 99 F.3d 1200, 1211 (1st Cir. 1996) (under New Hampshire law and the Restatement, statements of government employee were within scope of employment even when they plainly were not authorized); *see also Restatement (Second) of Agency*, § 230 (action may fall within scope of employment even if "forbidden, or done in a forbidden manner").

Because Mr. King was acting within the scope of his employment with respect to the allegations contained in Counts III-V, and because Mr. Chase concedes that such a finding is fatal to those claims, and given that his conceded failure to exhaust remedies with respect to Count IV is also fatal to that count, summary judgment shall enter in favor of the defendants on Counts III-V.

### V. CONCLUSION

For the reasons set forth more fully above, I GRANT defendants' motion for summary judgment as to Count I and Counts III-V, and DENY the motion as to Count II, the FMLA retaliation claim, with respect to Mr. King and the USPS.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT