UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
ROBERT CHASE                 )
                             )
            Plaintiff,       )
                             )
                             )    CIVIL ACTION NO.
                             )    12-11182-DPW
        v.                   )
                             )
UNITED STATES POSTAL SERVICE, )
and MICHAEL KING,            )
                             )
            Defendants.      )
```

MEMORANDUM AND ORDER
March 1, 2016

Plaintiff Robert Chase brought this action against his former employer, the United States Postal Service ("USPS"), and his direct supervisor, Michael King, alleging violations of his rights arising from the termination of his employment by USPS.

By Memorandum and Order dated November 4, 2013, I granted summary judgment for the defendants on all but one count of the Complaint, which alleges that the defendants unlawfully terminated Mr. Chase in retaliation for taking leave protected under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.  See Chase* v. *United States Postal Service*, 2013 WL 5948373 (D. Mass. Nov. 4, 2013).  After a non-jury trial on the remaining count, pursuant to Fed. R. Civ. P. 52, I provide — on

-1-

the basis of evidence recited in Section I.A. — the findings of fact in Section I.B., where I make credibility determinations and otherwise resolve factual disputes as necessary.  In Section II, I provide Conclusions of Law in support of my determination to order judgment for the defendants.

## I. FACTS

### A.   *Evidence at Trial*

Robert Chase worked for the USPS as a letter carrier from 1997 until his termination on September 30, 2011.  At all times during the course of his employment with the USPS, Chase's work performance was satisfactory or better.  He was punctual, reliable and attentive to his job, and he was never given a negative performance review or subject to any discipline or corrective action.

From February 2005 until the time of his termination, Chase was supervised by the defendant Michael King, who served as manager of the Brookline, Massachusetts Post Office where Chase worked.  Although perturbed by Chase's leave taking, King did not have any issues with Chase's performance as a letter carrier, and never had occasion to discipline Chase prior to the events that gave rise to this lawsuit.

1.   Chase's Injury

On July 21, 2010, Chase was involved in a serious motor
vehicle accident while on duty.  Chase was parked on the side of
the road during his lunch break when a car driven by an elderly
woman who had fallen asleep at the wheel struck his vehicle.
King responded to the scene and observed the severity of the
accident.  Chase was transported to the hospital and was
subsequently diagnosed with a shoulder injury that included
damage to his rotator cuff.  King wrote in an accident report he
submitted to the Boston District Safety Office: "Carrier
initially claimed to be ok.  Now claims injury to shoulder."

Chase was unable to return to work following the accident.
Anticipating that Chase would submit a workers' compensation
claim, King pressured Joseph DeMambro, the Brookline Post
Office's union steward for the National Association of Letter
Carriers, to encourage Chase not to file such a claim so that
the injury would not be reflected in the injury statistics for
the Brookline Branch.  Such statistics may have had some impact
on perception of King's performance as a manager.

King felt comfortable making such a request because he
believed Chase would be able to make a recovery from the driver
who had caused the accident, and therefore would not be left

without recourse.  Chase nevertheless filed a workers'
compensation claim, which was approved.  In accordance with USPS
policy, Chase was paid his full salary by the USPS for the first
45 days of his injury leave, after which he received workers'
compensation benefits amounting to two-thirds of his salary,
tax-free, plus health insurance, paid by the U.S. Department of
Labor's Office of Workers' Compensation programs.

Chase also applied for leave under the FMLA, to run
concurrently with his workers' compensation leave.  FMLA leave at
the USPS is unpaid unless the employee is otherwise entitled to
pay, for example because he or she is using accrued sick leave
or receiving workers' compensation benefits.  Chase received a
notice approving his request for FMLA leave retroactive to July
21, 2010, the date of his injury, and informing him that FMLA
protection was limited to 12 weeks in each calendar year.
Because Chase never returned to work, this meant that Chase's
2010 FMLA leave was exhausted as of October 12, 2010.

At the USPS, FMLA leave requests are processed through a
central office located in North Carolina.  The FMLA approval
notice indicates that it was copied to Chase's "manager" and
"supervisor."  King testified that he did not recall ever seeing
the notice and was unaware Chase had bee on FMLA leave until the

-4-

commencement of this litigation.   King testified that he could
not recall whether he had received similar notices in the past
in connection with other employees' FMLA leave requests.
According to King, Chase's leave status was designated as either
"IOD" (injured on duty) or "OWCP" (out on worker's compensation)
in the computer program used to track employee time records,
which indicated to him that Chase was out on paid workers'
compensation leave.   King acknowledged that a related computer
program would have indicated Chase's FMLA leave status, but said
that he never checked that program because he had no reason to
believe Chase was using unpaid FMLA leave at the same time he
was on paid workers' compensation leave.   King could not recall
another instance of an employee taking FMLA leave for an on-the-
job injury that was otherwise covered by workers' compensation,
and believed that in practice, employees would use FMLA leave
only as a last resort, for example, when they had exhausted all
their paid sick leave or had to care for an ill family member.

    As a result of Chase's injury leave, the Brookline branch
had to hire a temporary replacement letter carrier to cover his
route.

    2.   Chase's Arrest

    On September 18, 2010, while Chase was still on injured

leave, he and his brother Michael, who was also a Brookline letter carrier, were arrested at Michael's apartment in Brookline.  The arrest occurred when police officers investigating an earlier report of domestic violence between Michael and his girlfriend visited Michael's apartment and observed in plain view a baggie containing what they believed to be cocaine.  According to the police report, Chase, who was visiting Michael's apartment, grabbed the baggie off the table, and when ordered by police to drop it, indicated that it belonged to Michael.  Upon executing a search warrant for Michael's apartment, police discovered more drugs and evidence of drug dealing.  Chase was charged with possession of cocaine with intent to distribute, in violation of Mass. Gen. Laws ch. 94C, § 32A(a), and conspiracy to violate the drug laws, in violation of Mass. Gen. Laws ch. 94C, § 40.  Michael was charged separately.

A few days later, King learned from employees at the Brookline Post Office that Chase and his brother had been arrested on drug charges.  Someone also left a copy of a *Brookline Tab* article reporting the arrest in King's office.  The original article did not identify the Chase brothers as Brookline letter carriers, but the *Brookline Tab* later received an anonymous tip that the brothers were letter carriers, which

it confirmed with USPS Media Relations.   The article was then
updated online to reflect that the brothers were Brookline
letter carriers.   King testified that after the updated version
of the article was published, he received a call from a customer
asking whether her mail was safe.

King contacted Jeffrey Powers of the USPS Office of the
Inspector General ("OIG") to request that he obtain a copy of the
Chase brothers' arrest report.[1]   King also forwarded the original
*Brookline Tab* article to Lori Bullen, his supervisor at the
time, and stated "[i]t would be nice if we can proceed with
something."   Bullen forwarded King's email to Connie Marvin in
Labor Relations, informing her that not only was Chase arrested,
but that he was "out OWCP [on worker's compensation] to boot," and
that she would "like to see if we can't get removals for this."

At about this time, William Downes replaced Lori Bullen as
King's supervisor.   In response to an inquiry from Downes
regarding the Chase brothers' duty status, King stated "Michael
is on an off-duty.   Bobby [Chase] is out IOD [Injured On-Duty]
and the OIG is looking into his status."

---

[1] Powers was King's contact in the OIG.   At trial, Powers
described his relationship with King as that of "professional
friends" who knew each other from time spent together as
supervisors in the Postal Service.

King testified that after reading the arrest report and the
*Brookline Tab* article, he was concerned about the seriousness of
the crimes with which the Chase brothers were charged and the
resulting negative publicity to the Brookline Post Office.  He
decided to place Michael Chase on emergency off-duty status, but
took no similar action with respect to Robert Chase because
Chase was on injured leave and therefore was already off-duty.
King testified that if Chase had not been on injured leave, he
would have placed him on emergency off-duty status as well.
Because Chase was never placed on emergency off-duty status,
however, he was permitted to enter the Brookline Post Office
while Michael was not.

### 3.   Post-Arrest, Pre-Termination Period

In the weeks and months following Chase's arrest, King
periodically inquired of Jeff Powers regarding the status of the
Chase brothers' criminal cases, which he learned were repeatedly
continued.  At the same time, King was in somewhat regular
contact with Chase regarding both his arrest and the status of
his injury.  Shortly after the arrest, Chase met with King to
discuss what happened.  Chase told King that he was not a drug
user or dealer and that the charges against him were groundless
and would be dismissed.  By Chase's account, he was simply "in

-8-

the wrong place at the wrong time."  Chase perceived that King
accepted his version of events and was satisfied that Chase was
not a drug user or dealer and that the charges would be
dismissed.

Chase testified that in conversations that followed, King
expressed concern not with Chase's arrest or criminal case, but
with his extended injury leave.  Chase testified that King
exerted pressure on him to get medically cleared to return to
work, telling Chase he was "four guys down" and was "getting
killed by injuries."  Chase alleged that during one such
conversation, King threatened to "sic Jeff Powers" of the OIG on
him if he did not get himself medically cleared to return to
work, suggesting that Chase was exaggerating the extent of his
injury and thereby committing fraud.  Chase and King stopped
communicating after a December 2010 phone call in which King
told Chase to "go fuck yourself" when Chase requested his help
with an issue related to his medical leave.  The issue was that
Chase's physical therapist had denied him services because he was
not being paid by the Postal Service in a timely fashion.
Before approaching King with the issue, Chase had sought the
assistance of a USPS Human Resources representative to no avail.

### 4.   Termination

By January of 2011, King still had not taken any disciplinary action with respect to either Chase or his brother stemming from their September 18, 2010 arrests.  In a January 12, 2011 email to King, Andrew Cullen of USPS Labor Relations expressed incredulity that no action had been taken in the nearly four months since the arrest of the Chase brothers. Although Chase remained on injured leave at that time, Michael was being kept on emergency off-duty status.  Cullen did not recommend that any particular discipline be imposed, but simply indicated to King that he needed to move forward with the Chase brothers' cases in order that any discipline he might impose would be considered "prompt" under the terms of the applicable collective bargaining agreement, which provided that "[d]isciplinary actions should be taken as promptly as possible after the offense has been committed."

As a consequence, by letter dated January 13, 2011, King asked Chase to participate in a Pre-Disciplinary Interview ("PDI") scheduled for January 18, 2011 "in regard to your arrest concerning drug related activities."  The purpose of a PDI, which is the first step in the formal disciplinary process, is to

-10-

determine the facts concerning a particular incident.  It is
sometimes referred to by the USPS as an employee's "day in court."

Chase's PDI occurred over the telephone, with King, Chase
and DeMambro participating.  King asked several questions of Mr.
Chase regarding the circumstances surrounding his arrest.  Chase
declined to answer any questions, citing the advice of his
criminal defense counsel.  King was not pleased, and told Chase
something to the effect of "you're really not helping yourself by
responding this way."

Purportedly based on Chase's failure to answer any questions
at his PDI, King concluded that his "hands were tied" and that he
had no choice but to initiate Chase's removal from the Postal
Service even though his criminal case had not yet been resolved
and Chase had previously professed his innocence to King.  At
trial before me, King testified that it did not matter that
Chase had not yet been convicted of anything, because the fact
of his arrest, coupled with the fact that he refused to admit
any wrongdoing, was sufficient in his view to justify Chase's
removal.  King asked his new supervisor, William Downes, for
approval to remove Chase for unacceptable conduct.  Downes gave
his approval on January 27, 2011, and on January 28, 2011, King

asked Labor Relations to prepare a notice of removal for "Failure to Perform Duties in a Satisfactory Manner."

The removal notice, which was dated February 1, 2011 and signed by King, informed Chase that he was being removed for "Failure to Perform Your Duties in a Satisfactory Manner," specifically citing Chase's arrest and refusal to answer questions during his PDI.  The notice stated, "[y]our actions in this matter are considered to be very serious," and cited two specific policies in the USPS Employee Labor Relations Manual ("ELM"): Section 665.25 (Illegal Drug Sale, Use, or Possession)) and Section 665.16 (Behavior and Personal Habits).[2]  The notice

---

[2] As reproduced in the notice of removal, those sections provided as follows:

**665.25 Illegal Drug Sale, Use, or Possession**: The Postal Service will not tolerate the sale, possession or use of illegal drugs, or the abuse of legal drugs while on duty or on postal premises. Employees found to be engaged in these activities are subject to discipline, including removal and/or criminal prosecution where appropriate.

**665.16 Behavior and Personal Habits**: Employees are expected to conduct themselves during and outside of working hours in a manner that reflects favorably upon the Postal Service. Although it is not the policy of the Postal Service to interfere with the private lives of employees, it does require that postal employees be honest, reliable, trustworthy, courteous, and of good character and reputation. The Federal Standards of Ethical Conduct referenced in 662.1 also contain regulations governing the off-duty behavior of postal employees. Employees must not engage in criminal, dishonest, notoriously disgraceful,

explained that Mr. Chase would be removed on March 3, 2011, or later if his union filed a grievance on his behalf.

Through his union, Chase unsuccessfully grieved his termination.  During the grievance process, Chase's union informed him that it had brokered a deal with USPS Labor Relations whereby Chase could accept a 14-day suspension in lieu of removal if his brother Michael — who was also in the process of grieving a removal — were to resign.  Chase declined to pressure his brother to resign in order to save his own job and accordingly rejected the offer.  There is no evidence that Mr. King had any involvement in making this offer.

During the pendency of the grievance process but prior to final arbitration, Chase's criminal case reached a favorable

---

immoral, or other conduct prejudicial to the Postal
Service.

Notably omitted from the notice of removal was the remainder of Section 665.16, which states:

*Conviction for a violation of any criminal statute may be grounds for disciplinary action against an employee, including removal of the employee, in addition to any other penalty imposed pursuant to statute.* Employees are expected to maintain harmonious working relationships and not to do anything that would contribute to an unpleasant working environment.

ELM Section 665.16 (emphasis added).

resolution.   On August 31, 2011, the conspiracy charge was
dismissed outright, and the charge of possession with intent to
distribute was reduced to a charge of simple possession, to be
dismissed upon Chase's successful completion of one year of pre-
trial probation, including random drug testing.[3]

Chase presented evidence of this favorable disposition at a
final arbitration hearing on September 16, 2011, but otherwise
offered no other evidence concerning his guilt or innocence.
Chase testified at trial that during the arbitration hearing,
which was not recorded or transcribed, USPS Labor Relations'
representative Michael DeMatteo made a statement along the lines
of: "Don't let Mr. Chase fool you; he has been living a great,
tax free life while the rest of us have to come to work.   For
all he knows, all his paperwork is fraudulent."   DeMatteo denied
making this exact statement, but testified at trial that any
statement he made in this regard was aimed at correcting a
misrepresentation Chase had made with respect to his income
during his injury leave.   On September 30, 2011, the arbitrator
issued a written decision affirming Chase's removal on the
grounds that USPS had shown by clear and convincing evidence

---

[3] The possession charge was ultimately dismissed following
Chase's successful completion of the pre-trial probation.

that Chase had possessed a Class B illegal drug, which violated

a reasonable and equitably enforced USPS policy.  After

receiving the arbitrator's decision, DeMatteo forwarded it to

Jeff Powers and Kevin O'Leary of OIG, along with the comment:

"this is the employee who is out on comp."  It is unclear why

O'Leary would have had any interest in the outcome of Chase's

case, unless as King's October 4, 2010 email suggests, OIG was

also investigating a claim of injury fraud involving Chase.[4]

### 5.   Evidence that Chase Received Disparate Treatment

Chase offered substantial evidence at trial that tended to

show that King and the USPS treated Chase more severely than

other similarly situated employees.

The first such comparator was Brookline letter carrier

James Ferretti.  In August 2006, Ferretti was arrested for drug-

related charges while on duty.  Police found cocaine, syringes,

and other drug-related items on Ferretti, along with mail that

he was supposed to be delivering at the time.  When he was

---

[4] Jeff Powers testified that, although he could not recall, it
was "possible" that King asked him to investigate Chase for
injury fraud, and if he had, Powers likely would have forwarded
the complaint to Kevin O'Leary or another agent in OIG's workers'
compensation unit.  King denies ever asking OIG to investigate
Chase for injury fraud and there is no evidence of such an
investigation.

arrested, he had fresh needle marks on his arms and scarring consistent with drug use.  The circumstances of his arrest were publicized in detail in the *Brookline Tab*, including the fact that he was a Brookline letter carrier.

Nevertheless, instead of removing him, King determined that Ferretti, who was a known drug abuser with a past disciplinary record, would be a "perfect candidate for a last chance agreement."  King testified that he made this decision because Ferretti "fell on his sword" at his PDI and admitted that he was a drug user who had a problem and needed help.[5]  Ferretti was thus allowed to keep his job despite being a known drug user arrested while actively using drugs on-duty.[6]

Two other Brookline letter carriers under King's supervision, William Maroney and Christine Bailey, were caught by police using drugs in a parked car while Bailey was on duty. Both Maroney and Bailey had past disciplinary records. Nevertheless, because, according to King, they were issued summonses but not arrested, and succeeded in using a contact at the Boston Police Department to get the charges dropped before a

---

[5] Joseph DeMambro contradicted this testimony to a degree, testifying that King informed him of his decision to give Ferretti a last a chance agreement *prior* to conducting the PDI.
[6] Ferretti was eventually terminated two years later, when his continued drug use caused significant job performance issues.

criminal complaint was filed, King felt that he did not have enough evidence to pursue discipline of any kind.

For his part, William Downes also approved discipline for a postal employee, Richard Varriale, who, although concededly not under King's supervision, was arrested while on-duty for drug possession in April 2011, after having purchased prescription narcotics from another postal employee.  In lieu of removal, the Postal Service offered Varriale the option to retire, thereby preserving his pension rights.

The evidence also showed that King himself had been disciplined short of termination.  In 2007, King submitted records to his then-supervisor, Lori Bullen, indicating that certain employees had attended a safety talk when they had not in fact done so.  After inquiring of King regarding the inaccuracies, Bullen deemed King's account of the matter "not credible" and issued him a "letter of warning in lieu of 14-day time off suspension."  Then, in 2011, King's new supervisor, William Downes, issued King another letter of warning in lieu of a 14-day time off suspension for failure to deliver mail in a timely manner.  Both infractions were considered serious.

6.    Evidence Regarding Labor Relations Influence

The defendants offered evidence at trial suggesting that

the impetus behind King's decision to initiate the removal when
he did, four months after the arrest but prior to any resolution
of the criminal case, was due largely to pressure from Andrew
Cullen and Labor Relations to issue any discipline "promptly" as
required under the collective bargaining agreement.  Other
evidence adduced at trial, however, suggested that this
"promptness" requirement is not uniformly adhered to,
particularly where the conduct at issue is the subject of an
ongoing criminal proceeding.  In one instance, for example, a
postal employee within William Downes' region, Kevin Moore, was
not issued a notice of removal until over two and a half years
following his arrest for child pornography, and over five months
after his conviction and incarceration on that charge.

    7.   Evidence of King's Attitude Toward Injury Leave

Substantial evidence was adduced at trial regarding King's
attitude toward Chase and other employees who in his view took
unnecessary injury leave or otherwise abused the system.

According to the testimony of Joseph DeMambro, a repeated
source of conflict in the Brookline Post Office was King's
predisposition to believe that employees who were injured on the
job or required medical leave were faking their conditions and
were liars.

-18-

In September 2006, Chase injured his knee on the job and missed approximately one week of work as a result.  DeMambro testified that sometime after Chase returned to work, in November 2006, King announced over the public address system in the Brookline Post Office: "Will Bob Chase, the injury fraud specialist, please report to the office."  Then, in August 2010, following Chase's motor vehicle accident, King posted a job opening on the office bulletin board for an "injury compensation specialist," and made an announcement over the public address system directed at Chase that "there's a job posted on the bulletin board for any injury compensation specialist since you're the biggest fraud when it comes to injuries."  On a third occasion, King reportedly asked DeMambro if Chase was advising a co-worker who had been injured on the job regarding how to submit an injury claim, expressing his belief that Chase was the "biggest fraud when it comes to workers' comp."

Another employee of the Brookline Post Office, Maria Constantino, testified that she heard King say Chase was faking the injury he had sustained in the car accident.  On multiple other occasions, Constantino heard King announce over the public address system "Can I have the carrier on Route 92 [i.e., Chase] who is faking an injury come to the office, please?"  According

-19-

to Constantino, King's animus was not reserved only for Chase;
King had accused other employees of faking their injuries in the
past and had at least one such employee surveilled on her route.
According to Constantino, King would frequently withhold sick
pay from employees, forcing them to re-designate a sick day as a
vacation day or file a grievance through the union in order to
get paid.  Another employee, Wanda Jackson, testified that King
held a preconceived notion that employees were faking their
injuries, and often withheld pay on this basis.

    That King has a less than sympathetic view of medical leave
is suggested by his testimony about his own leave history.  In
his thirty-three years working for the USPS, with much of that
time spent as a letter carrier, King has never been injured on
the job and has never taken FMLA leave for any reason.  He
testified that he believes it would set a poor example for
someone in a management role like himself to be absent from
work.  As a general matter he does not take much sick leave, and
in fact has not taken a single day of sick leave since 1997.  In
June of 2001, he received a letter of commendation and a gift
certificate from his supervisor in recognition of his non-use of
sick leave during calendar year 2000.

King denied possessing any preconceived notions with regard to employees who take injury leave or making any disparaging remarks in that connection.  King also presented evidence regarding other employees of the Brookline Post Office who took FMLA leave while under his supervision and did not claim subsequent retaliation.

I do not find King's testimony in this regard credible and find rather that he was predisposed to view those on leave for injuries as putative malingerers who made his staffing work more challenging.

### 8.  Damages Evidence

Through an expert economist, Chase offered largely uncontroverted evidence of his lost earnings as a result of being terminated by the USPS.  At the time of trial, Chase was a forty-year-old male with a high school education who has worked for the postal service for most of his adult life.  After being cleared to return to work by his doctor, he reapplied to work at the Postal Service, but was told his application would not be considered because he previously had been terminated for cause.  Since being terminated, he remained unemployed until shortly before trial, when he obtained a part-time job at an auto-body shop for low pay and no benefits.  Evidence at trial supports

back pay losses totalling $270,071.00 as a result of his termination.

**B.   *Findings of Fact***

    In light of the evidence detailed above, I make the following findings of fact:

    Chase was injured on July 31, 2010, and remained unable to work as a letter carrier until sometime after King made the decision in January 2011 to terminate him.

    From the date of his injury until the date his termination became final on September 30, 2011, Chase was on injured leave and was receiving workers' compensation payments.  For the first twelve weeks following his accident, from July 21, 2010 until October 12, 2010, Chase's injury leave was also designated as FMLA leave.[7]  Although Chase otherwise might have become eligible for another twelve weeks of FMLA leave beginning on January 1, 2011, he was in fact ineligible because he had worked fewer than 1,250 hours in 2010.  *See* 29 C.F.R. § 825.110.

---

[7] The redundancy in the leave bases appears to be the result of a failure by the USPS to counsel Chase from taking FMLA leave at a time when paid leave was available.  Whether the result of bureaucratic indolence or fear of legal exposure for meaningful and helpful counsel, the USPS practice in this regard caused Chase to use FMLA leave at a time when it provided him with no benefit he was not then receiving from workers' compensation benefits.

King knew that Chase had suffered a serious injury that rendered him unable to work, and knew that Chase was on injured leave and was receiving workers' compensation benefits.  He did not know that Chase had applied for and was granted FMLA leave to run concurrently with the first twelve weeks of his workers' compensation leave.  Rather King believed that Chase was at all times out on compensatory - not FMLA - leave.

King believed that Chase was exaggerating the severity of his injury and had been out of work and collecting workers' compensation benefits for far longer than was necessary.  King believed this was not the first time that Chase had abused the system.  King repeatedly pressured Chase to return to work, and threatened to have him investigated for workers' compensation fraud if he did not return promptly.  King continued to pressure Chase to return to work even after his September 18, 2010 arrest.

In early January 2011, USPS Labor Relations urged King to take some action with respect to the Chase brothers' disciplinary cases.  At that point, almost four months had passed since their arrest.  Although King made the decision to remove Chase, the timing of that decision was accelerated by Labor Relations.

Having become increasingly fed up with Chase and having recently cut off communication with him when it became evident that Chase had no intention of returning to work anytime soon, King decided to exercise his discretion to seek Chase's termination.  In doing so, he treated Chase far less leniently than he had treated other employees arrested for drug offenses, who, unlike Chase, had been arrested while on duty and who had records of prior discipline.  King's decision to terminate Chase was motivated by animus over what he perceived to be Chase's abuse of workers' compensation leave, which was further aggravated by Chase's arrest on drug charges while he was out of work.  King was not, however, motivated by Chase's FMLA leave taking, of which he was unaware.

## II. CONCLUSIONS OF LAW

The twin purposes of the FMLA are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1) & (2); *Hodgens* v. *General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).

The FMLA contains two distinct types of provisions aimed at accomplishing these purposes.  First, it creates a series of substantive — or "prescriptive" — rights.  *Id.* at 159-60.

Eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per year for any one of the following purposes: when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(D); to care for a close family member with such a condition, 29 U.S.C. § 2612(a)(1)(C); or because of the birth, adoption, or placement in foster care of a child, 29 U.S.C. § 2612(a)(1)(A) & (B). *See also* 29 U.S.C. § 2611(11); 29 C.F.R. §§ 825.100(a), 825.114 (1997) (defining a "serious health condition"). Following a qualified absence, the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c) (1997). Second, the FMLA creates "proscriptive" rights which expressly protect employees against retaliation for invoking their prescriptive rights. *Hodgens*, 144 F.3d at 159 (citing 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220 (1997)). 29 U.S.C. § 2615(a)(1) provides: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(2) further provides: "It shall be unlawful for any employer to discharge or

in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  This means that employers are prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  *Hodgens*, 144 F.3d at 160 (quoting 29 C.F.R. § 825.220(c)).

Where, as here, an employee alleges a violation of his proscriptive rights under the FMLA, the critical issue is the employer's motive, and specifically "whether the employer took the adverse action because of a prohibited reason or for a legitimate non-discriminatory reason."  *Hodgens*, 144 F.3d at 160. The First Circuit has adopted a familiar framework to analyze "the tricky issue of motivation," which is analogous to that used in cases involving other types of discrimination, such as discrimination under Title VII of the Civil Rights Act of 1964. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973) (discrimination under Title VII); *DeNovellis* v. *Shalala*, 124 F.3d 298, 308 (1st Cir. 1997) (discrimination under ADEA); *Katz* v. *City Metal Co.*, 87 F.3d 26, 30 n.2 (1st Cir. 1996) (discrimination under ADA).

Under the *McDonnell Douglas* framework, an aggrieved employee bears the initial burden of adducing sufficient

evidence to establish a prima facie case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802; *Hodgens*, 144 F.3d at 160.  To make out a prima facie case for FMLA retaliation, the employee must demonstrate that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action.  *Hodgens*, 144 F.3d at 160 (citing *Randlett* v. *Shalala*, 118 F.3d 857, 862 (1st Cir. 1997)).

If the employee makes out a prima facie case, the burden then shifts to the employer "'to articulate some legitimate, non-discriminatory reason for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." *Hodgens*, 144 F.3d at 160 (quoting *McDonnell Douglas*, 411 U.S. at 802).  The employer must, through the introduction of admissible evidence, provide an explanation that is legally sufficient to justify a judgment for the employer.  *Id.* (citing *Texas Dep't of Community Affairs* v. *Burdine*, 450 U.S. 248, 255 (1981)).  "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains

the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." *Id*.  Even where the employer has successfully shifted the burden back to the employee, "evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual." *Id.* (citing *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 511 (1993)).

Here, it is undisputed that Chase availed himself of a protected right under the FMLA when he took leave for "a serious health condition that [made him] unable to perform the functions of [his] position," 29 U.S.C. § 2612(a)(1)(D), and that he was adversely affected by an employment decision when he was terminated.  It is equally clear that the defendants have provided a non-retaliatory justification for Chase's termination in the form of Chase's arrest on drug charges, and that his termination was upheld by an arbitrator as being supported by just cause.[8]  As in many FMLA cases, the question then becomes

---

[8] Chase did not move to vacate the arbitrator's decision and the propriety of that decision is not before me.  However, Chase has suggested throughout this litigation that the application of ELM Section 665.25 to his case was clearly erroneous because it applies only to on-duty drug use.  As reproduced in note 2,

whether the defendants' explanation for terminating Chase — that

he was arrested on drug charges — was pretextual, and whether

the real reason was Chase's taking of protected leave under the

FMLA.

As I observed in my November 4, 2013 Memorandum and Order

denying the defendants' motion for summary judgment on Chase's

retaliation claim, the Supreme Court's decision in *University of

Tex. Sw. Med. Ctr.* v. *Nassar*, 133 S.Ct. 2517 (2013) has created

some uncertainty regarding the appropriate causation standard to

apply in FMLA retaliation cases.  The Supreme Court in *Nassar*

held that Title VII retaliation claims "must be proved according

to traditional principles of but-for causation . . . [which]

requires proof that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or

actions of the employer."  *Id.* at 2533.  Because the framework

for analyzing FMLA retaliation claims is adopted from the Title

---

*supra*, that section reads as follows: **Illegal Drug Sale, Use, or
Possession**: The Postal Service will not tolerate the sale,
possession or use of illegal drugs, or the abuse of legal drugs
while on duty or on postal premises."  Although the issue is not
directly before me, I am satisfied that while not a model of
clarity, the clause "while on duty or on postal premises" can
reasonably be read only to modify the immediately preceding
clause, i.e., "the abuse of *legal* drugs."  Under such a reading,
the "sale, possession or use of *illegal* drugs" would be grounds
for termination regardless of whether such conduct occurred
while off-duty.

VII arena, *see Hodgens*, 144 F.3d at 60, the defendants re-
advance the argument they made on summary judgment that,
following *Nassar*, plaintiffs alleging FMLA retaliation must
establish but-for causation.  *See Chase*, 2013 WL 5948373 at *9.
Chase contends that absent a decision of the First Circuit
adopting *Nassar*'s but-for causation standard for FMLA retaliation
claims, he need only prove that his taking of FMLA leave was a
"negative factor" in the decision to terminate him.  29 C.F.R. §
825.220(c).  *See also Henry* v. *United Bank*, 686 F.3d 50, 55 (1st
Cir. 2012).

I concluded in my November 4, 2013 Memorandum and Order
that genuine issues of material fact in the record before me
precluded summary judgment on Chase's retaliation claim
regardless of which causation standard was to be applied.  *See
Chase*, 2013 WL 5948373 at *10-12.  After evaluating the evidence
and findings of fact after trial, however, I now find that the
outcome of this case hinges on which standard properly applies
and that I must identify which standard is applicable.

There has been no material development in the case law
since the issuance of my November 4, 2013 Memorandum and Order.
The question whether *Nassar* applies to FMLA retaliation cases
remains an open one.  Those Courts of Appeals that have

acknowledged the potential effect of *Nassar* in the FMLA context have expressly declined to consider the issue, concluding it made no difference on summary judgment or had been waived.  *See Lichtenstein* v. *Univ. of Pittsburgh Med. Ctr.*, 598 F. App'x 109, 112 (3d Cir. 2015); *Malin v. Hospira,* Inc., 762 F.3d 552, 562 n.3 (7th Cir. 2014); *Ion* v. *Chevron USA, Inc.*, 731 F.3d 379, 390 n.11 (5th Cir. 2013).  Two circuits, writing before *Nassar* but after the related opinion of *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167 (2009), which required but-for causation for ADEA claims, found that but-for causation was not required under the FMLA.  *Goelzer* v. *Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010); *Hunter* v. *Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009).

Most district courts to have confronted the issue have declined to apply *Nassar*'s but-for causation standard in the FMLA retaliation context either because it had not explicitly been adopted by a higher court, *see Kendall* v. *Walgreen Co.*, 2014 WL 1513960 *6 (W.D. Tex. Apr. 16, 2014) (absent contrary ruling from Fifth Circuit, court was "bound to . . . apply mixed-motive framework"); *Mathis* v. *BDO USA, LLP*, 2014 WL 975706, at *6 (S.D. Tex. Mar. 12, 2014) (until higher court says otherwise, *Nassar* does not change analysis in FMLA cases); *Chaney* v. *Eberspaecher*

*NA*, 955 F. Supp. 2d 811, 813 n.1 (E. D. Mich. 2013) (stating "the *Nassar* decision, while informative, did not change any applicable standards [in FMLA cases]"), or because it made no difference in the outcome, *see, e.g., Wanamaker* v. *Westport Bd. of Educ.*, 11 F.Supp.3d 51, 73 (D. Conn. 2014) (concluding question need not be resolved on summary judgment); *Slade* v. *Alfred Univ.*, 2013 WL 6081710, at *2 (W.D.N.Y. Nov. 19, 2013) (concluding plaintiff survived summary judgment under either standard); *Ford* v. *Berry Plastics Corp.*, 2013 WL 5442355, at *10 n.8 (D. Md. Sept. 27, 2013) (same).

Others, including my colleague Judge Stearns, have assumed *Nassar* would apply in the FMLA context. *DiBlasi* v. *Liberty Mut. Group. Inc.*, 2014 WL 1331056, at *10 n.20 (D. Mass. April 3, 2014) (observing "[w]hile *Nassar* dealt with a Title VII employment discrimination claim, Justice Kennedy's observation that common-law 'but-for' tort causation principles should be presumed to be the default rules adopted by Congress "absent an indication in the statute itself," applies with equal force in the FMLA context"); *see also Taylor* v. *Rite Aid Corp.*, 993 F. Supp. 2d 551, 567-68 (D. Md. 2014) (applying but-for causation to both Title VII and FMLA retaliation claims, but without noting any change in the law); *Sparks* v. *Sunshine Mills, Inc.*,

2013 WL 4760964, at *17 n.4 (N.D. Ala. Sept. 4, 2013) (applying but-for causation to FMLA retaliation claim following *Nassar* because FMLA employs statutory language similar to that found in Title VII).

For its part, the First Circuit has not directly addressed the applicability of *Nassar* to the FMLA.  Since *Nassar* was decided, the First Circuit has continued to use its old standards for FMLA retaliation claims, including applying the regulatory "negative factor" language rather than but-for causation.  *Ameen* v. *Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015); *Carrero-Ojeda* v. *Autoridad de Energia Electrica*, 755 F.3d 711, 718 (1st Cir. 2014).  However, these opinions do not mention *Nassar* and suggest only that the issue has not yet been squarely presented to the court.

Compelled as I am to decide, in the absence of controlling authority, which standard the First Circuit would apply if it confronted the issue, I conclude that *Chevron* deference is owed to the Department of Labor's regulations.  *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). Those regulations require me to find that Chase need only show that his protected taking of leave was a negative factor in his termination, not that it was a but-for cause of his termination.

-33-

*Nassar* establishes a "default rule[]" under which Congress is "presumed to have incorporated, absent an indication to the contrary in the statute itself," but-for causation as the causal standard when drafting statutes.  *Nassar*, 133 S.Ct. at 2525. The First Circuit has applied this default rule to the Rehabilitation Act, *Palmquist* v. *Shinseki*, 689 F.3d 66, 77, and that default rule should govern the interpretation of the FMLA as well.  However, but-for causation is merely a default, and in the FMLA it has been supervened by action to which I am obligated to defer by the agency delegated authority over the statute by Congress.

The Department of Labor has interpreted the FMLA to require only that it is unlawful to "use the taking of FMLA leave *as a negative factor* in employment actions."  29 C.F.R. § 825.220(c). Under this regulation, any meaningful causal connection between the taking of FMLA leave and an adverse employment action constitutes retaliation, even if the taking of leave was not sufficient to cause the adverse action on its own.  If deference is owed to this regulation, but-for causation is not required under the FMLA.

A *Chevron* inquiry is appropriate where, as here, an agency has promulgated regulations with the force of law pursuant to an

-34-

explicit statutory grant of rulemaking authority.   The
authorization and use of rulemaking authority is "a very good
indicator of delegation meriting *Chevron* treatment."   *United
States* v. *Mead Corp.*, 533 U.S. 218, 229 (2001).   *See also
Navarro* v. *Pfizer Corp.*, 261 F.3d 90, 99 (1st Cir. 2001) ("To
warrant *Chevron* deference, Congress must actually delegate
authority to that agency, and the agency must invoke that
authority").   Such an explicit statutory grant exists here, 29
U.S.C. § 2654, and the Department of Labor put forward its
interpretation under that grant, using formal processes.   This
contrasts sharply with *Nassar*, where the EEOC adopted its
interpretation only in a guidance manual.   133 S. Ct. at 2533-
34.   The Supreme Court in *Nassar* considered whether the EEOC's
interpretation was persuasive under *Skidmore* v. *Swift & Co.*, 323
U.S. 134 (1944), and found that it was not.   *Chevron* deference
was not at issue in *Nassar*.

The First Circuit has held that *Chevron* deference is
appropriate for Department of Labor interpretations of the FMLA.
*Hodgens* v. *Gen. Dynamics Corp.*, 144 F.3d 151, 160 n.4 (1st Cir.
1998) ("The Department of Labor regulations implementing the
FMLA interpret the Act this way, *see* 29 C.F.R. § 825.220(c) . .
. and those regulations are entitled to deference, *see Chevron* .

-35-

. .").  *See also Colburn* v. *Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005) ("Although the text of 29 U.S.C. § 2615(a) makes no reference to "retaliation," this court has recognized such a cause of action in the statute and specifically the interpretative regulation 29 C.F.R. § 825.220(c).").  That said, the First Circuit has not squarely addressed whether *Chevron* deference is appropriate since *Nassar* and, more specifically, has not addressed the issue of causation in dispute here.

Those courts that have directly examined the deference owed to this particular regulation have found, albeit pre-*Nassar*, not only that *Chevron* governs, but also that deference is appropriate: that the agency provided a reasonable interpretation of an ambiguous statute.  *See Bachelder* v. *Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122-23 n.9 (9th Cir. 2001) ("Congress authorized the Department of Labor to promulgate regulations implementing the FMLA. 29 U.S.C. § 2654. The department's reasonable interpretations of the statute are therefore entitled to deference under Chevron"); *Hunter* v. *Valley View Local Sch.*, 579 F.3d 688, 692 (6th Cir. 2009) ("We have already held that § 825.220(c) is a reasonable

interpretation of the FMLA entitled to deferential judicial review.").

I agree with these courts that the FMLA leaves ambiguous what causal standard governs in retaliation actions and that the Department of Labor has supplied one reasonable answer. The statute does not speak directly to standards for causation and provides no unambiguous indication that but-for causation is required. The relaxed causation standard provided by the Department of Labor is precisely the sort of "legitimate policy choice[]" that *Chevron* empowers a properly delegated agency to make. *Chevron*, 467 U.S. at 865 (1984).

*Nassar* does not reduce the deference owed to the Department of Labor in its interpretations of the FMLA. The Court's interpretation of Title VII does not render unambiguous the language of the FMLA. "Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Nat'l Cable & Telecommunications Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967 (2005). The *Nassar* court did not even address whether Title VII was unambiguous in this regard, much less whether the FMLA

was unambiguous.[9]  It rather determined what it believed was the best interpretation of that statute.  The ambiguities in the FMLA, however, remain delegated for the Department of Labor to resolve, if it chooses to do so by rulemaking, as it has. *Nassar* does not hold that an agency interpreting Title VII requiring but-for causation would be acting unreasonably; it simply concludes that the EEOC's "motivating factor" analysis was not persuasive.  *Chevron* requires a court to accept reasonable interpretations of a statute with which it disagrees. *Brand X*, 545 U.S. at 980.  While the *Nassar* Court – and perhaps

---

[9] In this respect, a minor textual difference between Title VII and the FMLA takes on new significance.  *Nassar* relied in part on the phrase "because of" in Title VII's anti-retaliation provisions, which it held implies but-for causation.  The FMLA, in contrast, does not use the phrase "because of."  Rather, it makes it unlawful for employers to "interfere with, restrain or deny the exercise of … any right provided" by the statute or to "discriminate against any individual *for* opposing any practice made unlawful" by the statute. 29 U.S.C. § 2615 (emphasis added).  The distinction between "because of" and "for" only adds to the ambiguity inherent in the statute.  Textually, "for" may mean something different than "because of."  Certainly, as a basic preposition, the word "for" allows a wide variety of meanings and uses; consequently, it is ambiguous.  The distinction also complicates comparisons between Title VII and the FMLA, because Congress appears to have intended the different phrasings to have different effect.  In this context, I must defer to the agency, I am not called on to offer my own interpretation of the FMLA provisions; I note only that while similar to Title VII in many respects, the differences between the two statutes heighten the ambiguities in the FMLA.

myself as well – might find the FMLA to be best read as
requiring but-for causation, judicial preference in
interpretations must yield in this setting to the agency's
reasonable interpretation.   Accordingly, I must answer the
following question: Did Chase's taking of FMLA leave ultimately
contribute to King's decision to terminate him?

Before I can address that question, however, I must clarify
what constitutes retaliation under the FMLA.   Obviously, an
employer cannot retaliate against an employee for taking FMLA
leave that the employer could not have known about.   *Ameen* v.
*Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir.
2015).   Either knowledge of the employee's FMLA leave, or notice
sufficient for a reasonable employer to learn that the leave was
FMLA-protected, is required.   In this respect, the courts have
not rested on formalisms.   For example, employers are liable not
only for punishing an employee who has specifically invoked the
FMLA but also for punishing an employee who took leave protected
by the FMLA even if neither employee nor employer actually knew
that the FMLA was involved.   *See, e.g., Dotson* v. *Pfizer, Inc.*,
558 F.3d 284, 295 ("employees do not need to invoke the FMLA in
order to benefit from its protections"); *Bachelder* v. *Am. W.
Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001) ("Whether

either [employer] or [employee] believed at the time that her …
absences were protected by the FMLA is immaterial, however,
because the company's liability does not depend on its
subjective belief concerning whether the leave was protected.");
*Byrne* v. *Avon Products, Inc.*, 328 F.3d 379, 382 (7th Cir. 2003)
("It is enough under the FMLA if the employer knows of the
employee's need for leave; the employee need not mention the
statute or demand its benefits.").  What matters is whether the
employer had notice of the need for FMLA leave, such that it
could determine that the leave was FMLA eligible.  This does not
require formal notice; inquiry notice is sufficient.  For
example, notice can be provided in the form of a visibly serious
medical condition, *Byrne*, 328 F.3d at 381-82, or through
communications sufficient to make a reasonable employer inquire
further to determine whether the absences were likely to qualify
for FMLA protection, *Bachelder*, 259 F.3d at 1131.

However, the converse must also be true.  On the one hand,
it is a violation of the FMLA for an employer to retaliate
against an employee who takes sick leave, without invoking the
FMLA, when the employer reasonably should have known that the
FMLA could be involved to protect the worker.  On the other
hand, it should not violate the FMLA for an employer to

-40-

retaliate against an employee who has invoked the FMLA, when the employer would reasonably have believed that the FMLA was not meaningfully invoked.  In the latter scenario, there is no actual intent to discriminate against the employee for exercising his rights, because the employer neither knew nor should have known that the rights were being exercised to any effect.  This follows directly from the many cases describing forms of notice that are insufficient to apprise an employer of an employee's need for leave. *See, e.g., Brenneman* v. *MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004).

This case is similar to that second scenario.  King was aware that Chase had suffered a serious injury; on its own, that would otherwise be enough to put him on notice of FMLA-eligible leave and support a finding of retaliation.  But King was also aware that Chase had taken paid leave, under terms more favorable than the FMLA provides.  Therefore, he reasonably believed that even though seriously injured, it would not make sense to Chase to take FMLA leave until — at the earliest — his paid leave expired.  If King reasonably believed that the FMLA's protections had been declined, he could not be held to have retaliated against Chase for taking FMLA leave.  *See* McNamara v. Trinity Coll., No. 3:12CV363 JBA, 2013 WL 164221, at *4 (D.

Conn. Jan. 15, 2013) (in "circumstances where a plaintiffs
conduct manifestly declines FMLA leave, thus granting notice to
the employer that he or she did not intend to exercise rights
under the FMLA," there cannot be FMLA retaliation liability).

I find that King actually believed that Chase was not
covered by the FMLA during the relevant period and that he was
reasonable in so believing.  Even the USPS's internal computer
system used to track employee time records marked Chase as
either "injured on duty" or "out on worker's compensation."
This case presents the unusual scenario in which formal, proper
but bureaucratically reflexive invocation of the FMLA fails to
provide a supervisor with the requisite notice or knowledge of
FMLA leave to ground a claim of retaliation.  Due to the unusual
combination and chronology of leave that Chase took, King
reasonably believed that Chase had not invoked FMLA coverage.
Operating under such a belief, King — as the relevant decision
maker — could not have retaliated against Chase for taking FMLA
leave.  That the USPS Human Resources apparatus did not warn
Chase away from redundantly and uselessly taking FMLA leave —
when he already had meaningful leave coverage — does not,
without more, robotically introduce his FMLA leave taking as a

-42-

negative factor in the defendants' termination decision.
Consequently, Chase's FMLA retaliation claim must fail.

I am of the view that this holding does not conflict with,
or call into question, those decisions that find retaliation
liability even when a defendant can in some sense be said to be
unaware that the FMLA has been invoked (or even when the FMLA
has not been invoked by name).  *See e.g. Dotson*, 558 F.3d 284,
*supra*.  There is to be sure an important, but incompletely
resolved issue regarding precisely what discriminatory intent is
made unlawful: all discrimination against an employee for acts
that are or may be covered by the FMLA, despite the employer's
lack of knowledge that the FMLA is implicated, or only
discrimination against employees known in some cognizable sense
to be invoking the FMLA itself.  The First Circuit has given
incomplete signals on what awareness of the FMLA's invocation
must be proven in a retaliation claim.  The First Circuit has
stated that "[w]hat is prevented is adverse action against the
employee for using the protected leave," *Keeler* v. *Putnam
Fiduciary Trust Co.*, 238 F.3d 5, 10 (1st Cir. 2001).  In
identifying grounds for finding the discriminatory intent
necessary for a retaliation claim, the court has looked for
"negative comments, complaints, or expressions of reluctance by

-43-

her superiors or co-workers about her FMLA leave-taking [or]
discussion of her FMLA leave status in performance reviews, etc.
[] that would lead us to think that defendants took her FMLA
requests or leave status into account when deciding to discharge
her." *Carrero-Ojeda* v. *Autoridad de Energia Electrica*, 755 F.3d
711, 720 (1st Cir. 2014).  Those sought-after pieces of evidence
necessarily require some connection to *FMLA* leave, not leave-
taking more generally.

    In almost all cases, any distinctions between these signals
may not be material.  The courts ascribe knowledge of FMLA
eligibility to employers based on inquiry notice alone.  In most
cases, therefore, an employer can be liable for retaliating
against an employee for "having availed himself of a right
protected by the FMLA, namely, the right to take medically
necessary leave time."  *Hodgens* v. *Gen. Dynamics Corp.*, 144 F.3d
151, 169 (1st Cir. 1998).

    This case, in contrast, poses an unusual situation, due to
the concurrent leaves provided by the FMLA and by workers'
compensation.  Chase's absence was protected by the FMLA for
twelve weeks, even while he received workers' compensation
benefits.  And that absence was a negative factor in Chase's
ultimate termination: King was angry with Chase over his absence

throughout the twelve covered weeks and this colored all the
ensuing events.  But as a factual matter, it was the workers'
compensation leave – not the concurrent FMLA leave – which
angered King and contributed to Chase's termination.  King not
only did not know that Chase had invoked the FMLA (in which case
he would have been treated as aware for causation purposes), he
believed to the contrary that Chase had not invoked the FMLA.
King effectively, if incorrectly, believed that Chase had
*declined* FMLA coverage and instead opted for workers'
compensation alone.

I hold that the FMLA does not impose liability on employers
who take adverse employment actions against employees, but who
demonstrate their belief, however mistaken, that the FMLA was
not invoked.  This seems to me inherent in the concept of
intentional retaliation.  I must nevertheless observe how rarely
this issue will affect litigants.  Where the employer is simply
unaware of the FMLA's protections, it could still remain liable
under theories of inquiry notice.  Employers with mixed motives,
in which both FMLA leave-taking and concurrent leave-taking are
negative factors in the adverse employment decision, can also be
liable for retaliation under the FMLA.  Retaliation liability is
avoided based on an employer's subjective knowledge only where a

finder of fact has determined that an employer *did not* intend to
retaliate on the basis of leave taken under the FMLA.  Formal,
written notice of FMLA leave-taking, even to some other branch
of an organization, will usually be sufficient to create
knowledge of FMLA leave.  But the particular facts of this case
are idiosyncratic in supporting my finding that the relevant
decision maker for the employer demonstrably believed that the
FMLA was not invoked, although it had been invoked formally.
For this reason, I conclude that FMLA leave taking was not a
negative factor in the defendants' termination decision.  The
findings supporting that conclusion are reinforced by the
passage of time after the FMLA leave was formally taken and
concluded and before the adverse employment action occurred.
The fact that no remaining FMLA leave would have been available
after the worker's compensation leave was concluded means that
prospective FMLA leave taking is not a factor in the decision
making.

### III. ORDER FOR JUDGMENT

    For the foregoing reasons, it is hereby ORDERED that
judgment enter for the defendants on the basis of these findings
of fact and conclusions of law and my November 4, 2013

-46-

Memorandum and Order granting defendant's partial summary

judgment.


                                        */s/ Douglas P. Woodlock*_____
                                        DOUGLAS P. WOODLOCK
                                        UNITED STATES DISTRICT JUDGE